Spear, J.
This cas'e involves a charge of conspiracy under the following indictment found in the Superior Court of Cumberland County: “The Grand Jurors for said State ¿upon their oath presént that Nick Vetrano of Asbury Park in the County of Monmouth in the State of New Jersey and Elizabeth Trocchio and Philomena Trocchio, of Portland in said County on the fourteenth day of February A. D. 1921, at said Portland feloniously did conspire and agree together with the malicious intent wrongfully and wickedly to kill, wound, maim and injure the person of one Pasquale DeSarno.”
This indictment is found in accordance with the provision of R. S., Chap. 128, Sec. 24. The part pertinent to this present-issue reads as follows: “If two or more persons conspire and agree together, with fraudulent or malicious intent wrongfully and wickedly to injure the person, character, business or property of another .... they are guilty of a conspiracy.”
■ The case comes up on exceptions to the admission of certain documentary evidence, to the refusal of the presiding Justice to allow Philomena Trocchio, one of the- alleged conspirators, the right of a separate trial; and upon appeals of each of the respondents, after conviction from a refusal of the presiding Justice to grant a motion requesting him to set aside the verdict in each case.
The State undertakes to prove its case against the alleged conspirators by the introduction of five letters and two confessions or admissions purporting to have been made, one by Elizabeth Trocchio, and one by Nick Vetrano.
*375 The parties immediately concerned in this alleged conspiracy were Philomena Trocchio, Elizabeth Trocchio her daughter, and Nick Yetrano her nephew. The inception of the alleged conspiracy, the State contends upon the evidence, originated in the mind of Philomena Trocchio; that its inspiration was a grudge which she cherished against Pasquale DeSarno for having gotten her daughter “in trouble,” and the purpose to employ a person, through the intervention of Nick Vetrano, to mutilate the face of Pasquale DeSarno by cutting a cross thereupon. • '
There is , no question, whatever, but that the letters clearly admissible, and the confession of Elizabeth Trocchio and Nick Vetrano, prove them to be guilty of the conspiracy chargéd unless relieved by the alleged failure of the State to prove the name of the object of the alleged conspiracy, which will be later discussed. The defendant, Philomena, however, strongly protests that the letters and confessions were not admissible as tending to prove participation in the conspiracy on her part, inasmuch as a conspiracy must first be established before the acts or words of alleged co-conspirators can become admissible.
We do not understand the rule of the admission of testimony, in proof of a conspiracy, to be as limited as above stated and claimed. ■ We think the true rule, as shown by ample authority is, that the aets^ and words of all parties alleged to be participants in the conspiracy, as well as all other testimony, are admissible in the discretion of the court, for the purpose of proving the fact of a conspiracy, but are not to be taken into consideration against any one of the parties concerned, until, from the evidence thus admitted, the fact of -a conspiracy is proved; after which the acts and words of each co-conspirator, whenever done or whenever shid, in furtherance of the common purpose are admissible against all the alleged conspirators, upon the ground that the act of one is the act of all.
We know of nothing about a conspiracy so solemn or sacred that it may not be proved like any other alleged criminal offense. Conspiracy, as generally defined, is a combination of two or more persons by concerted action to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means.
It is evident from that definition that the gravamen of conspiracy is “combination,” “concerted action” and “unlawful purpose.” We *376 can discover no rule, either in reason or law, why all evidence from whatever source, coming from the alleged conspirators themselves or from other parties, is not admissible to prove a combination of the parties accused, their concerted action and their unlawful purpose, precisely the same as similar evidence would be admissible to prove a combination or concerted action or unlawful purpose upon any other charge, either civil or criminal.
In other words, when in the discretion of the court all the evidence tending to prove a conspiracy is admitted, and the jury upon examination, comparison and deduction from that evidence, come to the conclusion that it is so connected as to warrant the inference that a conspiracy is proved, then the charge is proved against all. If, however, the evidence is not so connected as to warrant the inference that a conspiracy is proved against all the alleged parties, then those against whom the proof fails are exempt from the charge, and the acts and words of the alleged co-conspirators cannot be considered against them.
In confirmation of the above general statement of the rule the following authorities may be referred to: 5 R. C. L., 1088, 37. “Necessity of Direct Evidence. . . . Conspiracies need not be established by direct evidence of the acts charged, but may and generally must be proved by a number of indefinite acts, conditions and circumstances which vary according to the purposes to be accomplished. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of- the persons accused, done in pursuance of an apparently criminal or unlawful purpose in common between them. The existence of the agreement or joint assent of the minds need not be proved directly. It may be inferred by the jury from other facts proved. It is not necessary to prove, that the defendants came together and actually agreed in terms to have the unlawful .purpose, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. If, therefore, one concurs in a conspiracy, no proof of agreement to concur is necessary in order to make him guilty. His participation *377 in the conspiracy may be established without showing his name or giving his description.”
We cite this section in full, as every statement therein made, is fully verified by decisions from a wide range of jurisdictions. In Commonwealth v. Smith, 163 Mass., 411 the court make this statement: “A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy. Carson’s Am. Cas. on Conspiracy, Chapter 5. 3 Greenl. Ev. 93, 2 Bish. Crim. Proc., 227. United States v. Cole, 5 McLean, 513. State v. Sterling, 34 Iowa, 443. Archer v. State, 106 Ind., 426.”
In People v. Arnold, 46 Mich., 409, 9 N. W. Rep., 406 in an opinion by Judge Cooley the Michigan Court say:
“It is further urged that the court erred in receiving in evidence the admissions of John Snediker. These were admissions of a joint offense, made after its commission, and from their nature, it is said, could only be received against Snediker alone. But the fact that the offense is joint cannot exclude admissions. They are admissible against the party making them, and the court must protect the other by cautioning the jury not to permit the confessions of his alleged associate to prejudice him. If the participation of the other is not made out by independent evidence, there can be no conviction; but the existence of a conspiracy must commonly be made out by the detached acts and statements of the individual conspirators.”
12 C. J. 632 states the general rule of the admissibility of evidence in this class of cases as follows: “General evidence of the conspiracy and the nature thereof may in the first instance be received as a preliminary step to the more particular evidence showing the participation of a defendant. ‘This is often necessary to render the particular evidence intelligible and to show the true meaning and character of the acts of the individual defendants.’ ”
226 states the character of the evidence admissible. ‘ ‘The fact of a conspiracy may be proved by any competent evidence. The conspiracy may of course be shown by direct evidence, and, it is apprehended should be so proved if this character of evidence is *378 attainable. . Direct evidence is, however, not indispensable. Circumstantial evidence is competent to prove conspiracy. Proof of the combination charged, it has been said, must almost always be extracted from the circumstances connected with the transaction which forms the subject of the accusation. The nature of the crime usually makes it susceptible of no, other proof, and the rule which admits this class of evidence applies equally m civil and criminal cases.”
227 states the latitude allowed in the admission of evidence. “In the reception of circumstantial evidence great latitude must be. allowed. . The jury should have before them and are entitled to consider every fact which has a bearing on and a tendency to prove the ultimate fact in issue and which will enable them to come to a satisfactory conclusion. The government has the right to show the whole history of the conspiracy from its commebcement to its conclusion. But much discretion is left to the trial court in a case depending on circumstantial evidence, and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact.”
Numerous citations,will be found, under each paragraph, in support of the above rules.
In 51 Am. Dec. note 83, is found this statement: “And if it be proved that the defendants pursued by their acts .the. same object, often by the same means, one, performing one part and another another part of the same object, the jury will be justified in the conclusion that they were engaged.in a conspiracy to effect that object: The Mussel Slough Case, 5 Fed., Rep. 680.”
It is claimed by the respondent, Philomena Trocchio, that none of the evidence disclosed by the letters between her daughter and Vetrano, or their confessions, were admissible against her until a conspiracy in which she was a participant had been proved. Such is the general rule, but the exceptions are so numerous that in nearly all the jurisdictions of this country the order of introducing all testimony upon conspiracy charges, is left to the discretion of the presiding Justice.
In Comm. v. Waterman, 122 Mass., 59 it is said, “The. order in which testimony is introduced is largely in the discretion of the court.” In Comm. v. Smith, 163 Mass., 418 it was held that “The order of introducing the evidence is within the discretion of the *379 presiding judge.” In Spies v. People, 122 Ill. 1, 3 Am. St. Rep., 489 in an exhaustive note it is said, after stating the general rule, “The exception, however, to this general rule is that the state may prove the facts in any order it chooses as to conspiracy, in acts done and declarations made.” See also many cases cited.
We find no case in Maine not in harmony with all the foregoing principles of law concerning rules of evidence applicable to proof of conspiracy. Perhaps the most elaborate case in this state upon the questions here involved, is Strout v. Packard, 76 Maine, 148. In a learned opinion by Justice Symonds, although he does not elaborate, yet, he states the rule touching the kind, character, scope and admissibility of evidence tending to prove conspiracy, which is in accord with the general principles before stated. The summary of his finding is found in next to the last paragraph of his opinion on Page 157. We can find no authority, and we can see no reason, for allowing the jury to regard the disconnected act of one of the defendants at another time and place as evidence pertinent to the issue, whether another defendant was guilty of a joint trespass on the night in question. That was the effect of the rulings given accompanied with the refusal to give the instruction requested.”
The effect of the whole opinion is, that, although all of the evidence of the alleged participants was admissible, the jury could “regard” it, against those only who were proven, by legitimate inference from that evidence, to have been participants.
The defendant further claims that conspiracy cannot be found under the evidence against any of the respondents, because the criminal act agreed upon, was not carried into effect. But that contention cannot prevail. 5 R. C. L., 1066, 7 states the rule: “While the gist of the civil action for conspiracy is the acts done in pursuance thereof, and not the combination, the criminal offense, at common law, is complete as soon as the confederacy or combination is formed. The legal character of the offense depends neither upon that which actually follows it nor upon that which is intended to follow it; it is the same whether its object be accomplished or abandoned. It may be followed by one overt act, or a series of them, but the offense is complete without any subsequent overt act.”
In an elaborate note in People v. Richards, 51 Am. Dec. 82, the rule is stated this way: “When the unlawful agreement is established *380 the offense is complete. The object need not be attained, nor need anything be done in pursuance of the agreement. No overt act need be proved; it is an offense complete and consummate in itself.” See also numerous citations.
One other legal aspect is to be noted before considering the testimony. The point is raised that Nick-Vetrano, being a resident of New Jersey cannot be held as a party to a conspiracy in contemplation of a crime to be committed in the State of Maine. A most recent case upon this subject is found in Strassheim v. Daily, 221 U. S. 280 in which it was held: "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power.” Cases covering a wide jurisdiction both in this country and in England may be cited in support of the above principle.
We now come to a discussion of the application of the foregoing principles of law to the evidence admitted in the case. It appears, from the record that after all the oral testimony had been presented, the State then offered the various exhibits represented by the letters and the written confessions of Elizabeth and Nick. Instead of inserting the exhibits at this point, we have prefixed them in the form of a- statement of facts to the opinion, to which reference will be hereafter made by indicating the number of the exhibit. Except as to the defense, which will be discussed later, by the claimed failure of the State to prove the name of the proposed victim, we do not deem it necessary to discuss the evidence with respect to the guilt of Elizabeth Trocchio and Nick Vetrano, found by the jury. That a diabolical scheme was abetted by these two parties, a violation, not only of all law, but of the instincts of fair play and decency, and worthy only of the vendetta of Corsica from whence it came, and evidence of a depraved and cowardly nature, is proved beyond cavil.
“0, Conspiracy, ashamedst thou to show thy dangerous brow by night when evils are most free?
0, then, by day where wilt thou find a cavern dark enough to mask thy monstrous visage?”
There is no moral doubt that Philomena Trocchio was the author of the atrocious scheme to mutilate the face of Pasquale DeSarno. And we now come to the question whether the testimony and the exhibits, under the legal principles above enunciated, afford sufficient *381 evidence to connect her with the offense charged? We think they do.
Before examining the exhibits it may be enlightening to refer to the circumstances surrounding the inception of this case. Independent of the question of conspiracy, evidence of particular acts are admissible, and may be considered with reference to proof of conspiracy. See cases cited. When and where did this case start? There can be no question that, as a matter of proven fact, it started with the letter No. 1 represented by Exhibit 6.
How did it start? Nick Vetrano, an Italian living in New Jersey, was her nephew and knew her in the “old country” as he says, but that he hadn’t heard from her, and in fact, didn’t know where she was. No family relations existed in the least between Nick and his aunt, either by correspondence, or communication in any other way. Elizabeth says in Exhibit 3. “We had a hard time to get your address.” Yet at this moment Mrs. Trocchio was anxious to obtain Vetrano’s address. Had she a motive? If so, what? Philomena Trocchio was the mother of a family living in Portland. She had at least two daughters, one of whom, as is expressed in the testimony, had been gotten “into trouble” by Pasquale DeSarno. She, therefore, had a violent grudge against DeSarno on that account. These are undisputed facts. Is there any question as to a motive in seeking Nick? After having discovered the residence of her nephew, she then went entirely outside of the family to Mary Grace Polino, and dictated the letter marked Exhibit 6. The husband had no knowledge of this letter, nor so far as the evidence shows did the children. These then, were the circumstances, the undisputed facts, and with this letter the plot opened.
Mary Grace was a witness and testified that she had read the letter to' Philomena, who said that she wo.uld like to know of Nick if he wrote Italian or American, because she had something to tell him that nobody should know. When this letter, with the others, was shown Philomena, she did not deny her knowledge of them, or having dictated the letter written in Italian, but answered, as the Sheriff stated, “As I recall, she made motions with her hands and says, ‘friendly letters, friendly letters.’ ” There is accordingly, no question as to the admissibility of Exhibit 6.
It is plain, however, that Exhibit 6 does not in itself express any direct evidence of guilt. Even so, when compared with Exhibit 3, we are of the opinion that the writer of Exhibit 6 will be traced *382 directly to the authorship of Exhibit 3. It is not questioned that Exhibit 3 was written by Elizabeth, the sixteen-year-old ’daughter of Philomena. This relationship is significant, and should be borne in mind in comparing thé subject matter of Exhibit 6 with the subject matter of Exhibit 3. So striking is the similarity of facts and expression in the two exhibits that if we compare them sentence by sentence, or subject by subject, the statements in No. 6 practically dovetail into the statements in No. 3.
By'comparing the two exhibits the following inferences'appear:
First, Exhibit 6 says, “Now that I have been able to attain your address,” and Exhibit 3 “We have had a hard time to get your address.” While the significance of this is not important, yet one is an echo of the other.
Second, the very first inquiry that Philomena ever made in her letter to Nick was, “Now let me know if you can write American.” Exhibit 1 Nick’s reply to Exhibit 6, says, “I can read and write either in American or Italian and the only one in the family that can do so.” Three days later Elizabeth wrote'to Nick in English in which she says, “Write it in English,” and then repeats the injunction, “Write in English because nobody know how to read or write in the other kind of way. Write in English etc.” Therefore, Elizabeth wrote to Nick to do just what the mother had asked him if he could ■do. Was it a coincidence that Elizabeth, sixteen years old, should think of this without suggestion?
Third, Exhibit 6 theh states;, after asking Nick if he can write American, “I can let my children write to you in American.” Three days later Elizabeth did write to Nick in English, — American. Exhibit 3, the first letter of Elizabeth dovetails precisely into what the mother said in her letter h.er children could do. For Elizabeth did write in American, and this is exactly the way the mother said she could communicate with him. The connection of the mother with Exhibit 3, shown by the last comparison is emphatic when analyzed in connection with the writing of Exhibit 6 in Italian, by a stranger, and the writing of Exhibit 3 in English, by Elizabeth. She knew when she went to Mary Grace Polino that her children could not read or write Italian. She did not know 'whether Nick could write in English or not. She therefore, went tp Mary Grace and dictated to Nick the letter containing the inquiry whether he could *383 write in American. If he could, she says, “I can let my children write to you in American, as I want you to know some facts of serious nature.”
She did not go to the Italian girl again for the correspondence, but Elizabeth answered Nick’s letter. Nick’s letter was written to her mother addressed to her upon t,he envelope, and saluted her as “Dear Aunt,” and had no reference to Elizabeth. Why should Elizabeth answer this letter at all? Was it another coincidence, or was she directed to do just what the mother wrote Nick the children could do. The answer to this question by necessary implication connects the mother with the contents of this letter.
Fourth, Exhibit 6 said to Nick, “I want you to know something of serious nature.” Exhibit 3 shows that Elizabeth did communicate to Nick something of a serious nature. The letter says, “She wonts you to get him for her and get a god one and let use know about it. Write it in English. She wonts to know how much he wonts. Let use .... she wonts a god one she wonts him to cut bis face .... she wonts him to get his face give to cuts make it a cross on his face. Let use know how much he wonts.” Can there by any question that Exhibit 3 written to Nick, and the first and only communication to him after the writing of Exhibit 6, was an explanation of what was meant in Exhibit 6 by, “facts of serious nature?” Is it another coincidence that this young girl, sixteen years of age, answered Nick’s letter written to her mother, in explanation of a statement made in Exhibit 6, the contents of which, so far as the evidence shows, she knew nothing, and which was written in Italian, which £he could not read, and by another person? The proof is conclusive that the facts of Exhibit 3 were dictated by the one who wrote Exhibit 6.
Fifth, Exhibit 6 the-first letter, so far as the evidence shows, written by Philomena to Nick, closes with this precatory sentence, “I beg of you to answer by return mail.” Under the circumstances, that was a signficant request and showed that there was- something pressing upon the mind of Mrs. Trocchio, and the echo to that is found in the closing sentences of Exhibit 3 in which it is said, “Answer quick if you get him let use know quick.” Further along, “If you get him or not answer just as quick as you can. Quick answer we are waiting.”
*384 Sixth, the language of Exhibit 3 clearly refers to something that had been before told to Nick. Elizabeth, when she commences to write about the employment of some one “to cut his face,” uses this language, “Them words that she said and tell you.”
What did she refer to by “them words that she said?” It is obvious, in view of the fact that Nicle could have had no information as to what his aunt desired, except what was contained in her letter, that it referred to what in her mother’s letter was expressed by the language, “facts of a serious nature.” That language as well as all the other language of the letter by reference to “she,” time after time, prove conclusively that somebody dictated Exhibit 3 to Elizabeth Trocchio. Who was it? By the process of elimination, there can be possibly but one person, and that person is Philomena Trocchio, her mother, who had before dictated Exhibit 6.
In view of the fact that Exhibit 6 was written for Philomena in Italian; that no copy of it was kept; that Elizabeth could not read Italian; that there was no evidence that in any way she knew what it contained; and that the material contents of Exhibit 6 are translated in substance and almost in form into the composition of Exhibit 3; prove conclusively that Elizabeth was not the author of Exhibit 3, but that whoever dictated Exhibit 6, was; and-establish the succession of acts in pursuit of a common cause and to accomplish the same end, each of which in itself, may not be sufficient to prove a conspiracy, but when all are considered together warrant the inference that Philomena was a participant.
It may be suggested, however, that Exhibit 6 and Exhibit 3 when read together are so uncertain and vague that their contents do not prove a conspiracy. But evidently the phraseology in Exhibit 3, “get a god one she wonts him to cut his face .... she wonts him to get his face give to cuts make it a cross,” was quickly and fully understood by Nick, as on February 4th within three days after receiving Exhibit 3 he answered in Exhibit 2 as follows:
“Dear Aunt:
Your letter received and was glad to hear from you. I went to see a fellow about what you wanted done and he wants $400.00 /100 as it is to far away. I also saw another and he wants $200.00 /100 and expenses. If you think either of these will do why send two railroad tickets and I will come with him myself.”
*385 For some cryptic reason, perhaps, the language of the letter was symbolic to him of just what Philomena Trocchio wanted him to do. The contents of Exhibit 3 may seem to us like looking through a glass darkly, but Nick evidently felt that he was seeing face to face. But whether that be so or not, Exhibits 6 and 3, are but links in the chain of exhibits which present a perfect case of conspiracy, so far as proof of the participants are concerned. Exhibits 2 and 4 are connected continuations of 6 and 3, and when all read together make a perfect whole. A conspiracy being established, Exhibits 5 and 7 the confessions of Elizabeth and Nick, are admissible. Upon all the evidence we are of the opinion that a conspiracy is clearly proved against Philomena Trocchio, as well as against Elizabeth Trocchio and Nick Vetrano. The conclusion that the jury were authorized from all the testimony to find that Philomena was guilty of conspiracy takes care of the other exceptions, and renders fruitless the exception to the refusal of the presiding Justice to grant her a separate trial, her guilt removing even the color of abuse of discretionary power by the justice.
But upon the motion it is contended, although a conspiracy may have been shown, so far as a concerted agreement is concerned, that nevertheless, the verdict must be set aside, because the State failed to prove by name that Pasquale DeSarno was the object of the conspiracy, as named in the indictment.
In support of this contention they cite Commonwealth v. Harley, 7 Met. 506 and Commonwealth v. Kellogg et al, 7 Cush., 477. In the Harley Case a conspiracy was charged to defraud Stephen W. Marsh. The court held that the allegation, naming Marsh, was material and must be proved, and say: “But that allegation could not be established by proof that the defendants conspired and agreed together to cheat the public generally or any individual they might be able to defraud.” The Kellogg Case passed upon a similar question, cited the Harley Case a.nd briefly stated the issue as follows: “It was contended that a general intent to defraud, if it operated, when carried into effect, to defraud a particular individual, might well authorize the charge of a conspiracy to defraud such person, though that person was not in contemplation of the parties at the time of entering into the conspiracy, and it did not appear that the defendants had agreed to perpetrate the fraud on him particularly. But it was held, that proof that the defendant conspired to defraud the *386 public generally, or any individual it might meet and be able to defraud, would not sustain the indictment charging, as it did, a conspiracy to defraud the individual who was named in the indictment.”
That is not at all what the State undertook to prove and did prove in the present case. The evidence from beginning to end pointed, not to the public generally, nor to any individual whom its evidence might happen to involve, but to one particular definite individual,— the man who had gotten the daughter in trouble. The present case is clearly differentiated for this reason from the rule in the Kellogg Case which is stated as follows: “It would be improper to apply to the original conspiracy the purpose to defraud the party who was eventually defrauded, but not within any previous purpose or design of the conspirators or in reference to whom the conspiracy itself had any application.” In the present case every conspirator and especially the mother and Elizabeth had designs upon a particular person to whom the conspiracy, itself and alone, also applied.
There is no moral uncertainty in regard to that fact. Under the above requirements of proof we are of the opinion that there is sufficient evidence to sustain the verdict of the jury. v
We have said that the jury had a right to find upon all the testimony that the parties named in the indictment were guilty of a conspiracy to do personal injury to the man whom Philomena and Elizabeth claimed to have wronged the daughter. There is no question but that they knew who the man was, and we think, from the letters, that the jury had a right to decide that Nick also knew who he was. State’s Exhibit 4, letter number 5, reads as follows: “Dear Nick, you know who my mother wants to have his face cut you know him he has been near you their she said that you know him.” However this may be, the knowledge of one was the knowledge of all. 5 R. C. L., 1089, Par. 39, and cases cited. The indictment set out the name of Pasquale DeSarno as the object of the conspiracy.
The State must prove that the conspirators intended Pasquale DeSarno, not some other man. The jury had a right to say that the evidence did not in' the least point to any other man. They had a right to assume that proof of the name in the indictment was prima facie evidence of the man intended. Proof of the name of the man intended is all the law requires.
*387 There is not even a reasonable doubt that the conspiracy was to do personal injury, namely to cut a cross upon the face of the man who Elizabeth said had got her sister in trouble.
Sheriff Graham testified in open court: “I asked her if she wanted to get a man to come and cut the face of .... I can’t recall the name of the Italian. At that time I had it in mind, and she says, “Yes.” I said, “The man that made trouble for yoim sister?” She says, “Yes. That is the man I want to have cut.” She said “Wouldn’t you do it?” Q. “Was his name mentioned between you in the conversation? A. Yes. I mentioned the first name. At the minute the name has slipped me.” He later testified that the name he mentioned was Pasquale.
Can there be any question that a particular person was meant by Elizabeth and her mother? And had not the jury a right to infer that when the name Pasquale was mentioned by the Sheriff that Elizabeth knew exactly whom he meant?
In our opinion the jury had sufficient evidence to warrant them in finding proof of the name. Philip W. Wheeler a deputy sheriff went to New Jersey to bring Nick Vetrano to Portland on extradition papers. When Nick was arrested in New Jersey there was found upon his person Exhibits 3, 4 and 6, the incriminatory letters. He had read them and understood their contents. Exhibit 7, is his affidavit to the same effect. During an interview with Nick concerning his connection with the case Deputy Wheeler testified as follows: “Q. Did you have any talk with Nick on the way with reference to his connection with the case? A. I did. Q. Will you tell the jury any thing he had to say about it? A. Why he said that he had answered those, letters and had received letters with reference to sending somebody down to cut up this man. Q. Did he mention the name of the man or did you mention it? A. I mentioned it, yes. Q. What name did you mention to him? A. Pasquale DeSarno. Q. What did he say to that? A. He said he couldn’t seem to place him; didn’t know as he could place him; didn’t know who he was; didn’t think he did.” That answer is a crippled denial, and the jury under the circumstances had the right to infer that he did know who Pasquale DeSarno was, especially so, when considered in connection with the letter written by Elizabeth arid found upon his person, that he did know the man; that he lived near him and that her mother said he knew him. However that may *388 be, the testimony above recited was delivered in open court in the ' presence and hearing of all the respondents, and disclosed to them, what they already knew, that the man whom the State was proving to be the object of their conspiracy was Pasquale DeSarno, the same name that was alleged in the indictment, and the same name stated to Nick. Furthermore, Sheriff Graham testified that Elizabeth said the name «of the man who had gotten her sister in trouble was Pasquale. This also was testified to in open court in the presence of all the parties. In .view of the circumstances connected with the case and the trial, and that Pasquale DeSarno was named in the indictment and was stated to Nick to be the name, the jury was warranted in the inference that Elizabeth meant Pasquale DeSarno, .otherwise she would have added another name if she had in mind another person. There was only one name in her mind and she knew perfectly who he was, hence her answer was confined to a particular Pasquale, the same Pasquale named by Wheeler, to wit, Pasquale DeSarno. Furthermore, there is no variance between the proof and the allegation of the name in the indictment; the evidence of Wheeler is that it is Pasquale DeSarno; the evidence of Graham is that Elizabeth said it was Pasquale, corroborative so far as it went.
None of the evidence is disputed. The jury had a right to regard it as all true, and to draw therefrom and from all the circumstances and probabilities any and all inferences that the closest analysis would permit.
Tf the indictment in the present case had named the object of the conspiracy as some one unknown there would not be the slightest question as to whom the evidence pointed and that conspiracy was to mutilate the man, whoever he might be, who Elizabeth claimed, had gotten her sister in trouble. The State declared his name was Pasquale DeSarno. It was therefore incumbent upon the State, having named the man, to prove the name, only. Such proof is deemed necessary, only in order to give the respondents notice of the person named, that they might be able to meet the allegation by proving some other Pasquale DeSarno than the one named in the indictment or some other man altogether, which would be the only possible defense open to them; and to plead autrefois convict, Commonwealth v. Hunt, 4 Met., 111.
It is, therefore, evident that the name of the object of the conspiracy is merely an incident of the conspiracy not necessary to proof of it, the conspiracy itself being the gravamen of the charge.
*389 The conspiracy having been proved against all to procure the mutilation of the person who had gotten the sister in trouble; Elizabeth being merely the amanuensis of her mother in writing the letters to Nick; the mother having said to Nick, in one of the letters, so written: “Dear Nick you know who my mother wants to have his face cut you know him he has been near you their she said that you know him”; Elizabeth having been found by the jury to know the name to be Pasquale DeSarno; and Elizabeth being the mere mouthpiece of her mother in writing the letters, it therefore follows, that she wrote what her mother told her to write and, consequently when she wrote “she said that you know him” the only rational inference to be drawn from that statement is, that the mother knew the object of the * conspiracy to be Pasquale DeSarno, when she dictated that letter.
We are of the opinion that the jury had sufficient evidence before them to warrant them in the deduction that the State had sufficiently proved the name of the person intended as the object of the conspiracy.

Exceptions overruled.

Appeal denied.