**STATE of Maine**

v.

**Jeffrey Don MAXWELL.**

Supreme Judicial Court of Maine.

Nov. 25, 1974.

Henry N. Berry III, Cumberland Co. Atty., Peter G. Ballou, Asst. Atty. Gen., Portland, for plaintiff.

Millard E. Emanuelson, Edward T. Richardson, Jr., Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD, and DELAHANTY, JJ.

WEATHERBEE, Justice.

Jeffrey Don Maxwell was found by a jury to be guilty of the offense of Armed Assault and Battery under 17 M.R.S.A. §

201–A.[1] On June 21, 1973, he was sentenced to a term of two to four years at the state prison, and it is from this conviction and sentence that he appeals.

The incident which led to an indictment under 17 M.R.S.A. § 201–A took place in a Portland tavern around one o'clock on the morning of May 1, 1973. Shortly before the incident transpired, the Defendant had entered the tavern to enjoy a late night ale. He wore both a cervical collar (a firm collar device to support the neck) and a shoulder immobilizer (a strap which held his right arm close to his body) as a result of his recent involvement in an automobile accident. When the Defendant entered the tavern, he had with him, tucked into his shoulder immobilizer, an unloaded .357 Magnum revolver. Defendant stated that a hunting friend had returned the gun (borrowed from Defendant) that evening, and that its untimely stowage upon Defendant's person was merely a temporary act of safely keeping the gun.

At about 12:45 a. m. the bartender announced the traditional "last call", and just before 1:00 a. m. (closing time) he proceeded to gather up the bottles and glasses which remained on the tables and bar. He removed an unfinished bottle from in front of the Defendant, who was at the moment standing aside engaged in conversation with other customers.

When the Defendant discovered his bottle had disappeared, he leaned across the bar in an attempt to appropriate a replacement bottle of ale from the cooler. The bartender pushed Defendant's hand away from the cooler, and in irritated response the Defendant climbed up onto the bar and (according to the testimony of State's witnesses) drew his gun and jumped down upon the bartender. A struggle between the two men followed during which the Defendant struck the bartender on the head with the gun. (The Defendant testified that the gun "popped" out as he "fell across" the bar, and that after retrieving it, he fell to the floor behind the bar. He testified that the gun may have hit the bartender's head accidentally, but Defendant denied there was any intentional striking.) With the aid of other tavern customers, the bartender gained possession of the gun, and subsequently used it to hit Defendant on the head.

The altercation moved to the kitchen area of the tavern into which the bartender had retreated still holding the Defendant's gun. At the bartender's request, a patron was attempting to call the police and the Defendant tried to "rip the phone out". Failing at this, the Defendant threw a deep fat frying basket at the bartender. When the bartender aimed the empty gun toward the Defendant, the Defendant started to break a beer bottle intending, he testified, to "utilize it" on the bartender. The Defendant desisted when a girl shouted, "Jeff, don't."

The altercation ended at this time with Defendant abruptly leaving the tavern and running down the street. After a short period of reflection, while still in the vicinity of the tavern, the Defendant approached a police vehicle (which had responded to the customer's call) and reported the affair.

At the close of all the evidence, the Defendant moved unsuccessfully for judgment of acquittal. He was convicted and sentenced, and now on appeal raises three claimed errors. First, Defendant claims

---

1. "§ 201–A. Firearm

Whoever, if armed with a firearm, unlawfully attempts to strike, hit, touch or do any violence to another, however small, in a wanton, willful or angry or insulting manner having an intention and existing ability to do some violence to such person, is guilty of an armed assault. If such attempt is carried into effect, he is guilty of an armed assault and battery. Any person convicted of either offense shall be punished by imprisonment for not less than 2 nor more than 25 years. The imposition or execution of a sentence for a violation of this section shall not be suspended and probation shall not be granted."

that the presiding Justice erred in his instruction to the jury concerning the elements of Armed Assault and Battery under 17 M.R.S.A. § 201–A in that, Defendant argues, the statute requires use of a *loaded* gun. Second, Defendant contends that the Court erred in its instruction defining "reasonable doubt". Third, Defendant claims that the presiding Justice erred in admitting, over Defendant's objection, evidence of events which took place after Defendant had lost possession of his firearm. Each of these points was properly saved for appeal, and we shall consider each in order.

*Instruction on the Scope of 17 M.R.S.A. § 201–A*

The basis of the Defendant's first issue is presented squarely by the Justice's instruction. The presiding Justice's instructions on 17 M.R.S.A. § 210–A included a lengthy explanation of the elements of assault and battery. The Justice then told the jury:

> "Now, the law is that if the weapon with which the assault was made was a firearm, it is immaterial whether the firearm was loaded or unloaded."

The Defendant duly objected to this part of the Justice's instruction and his argument on appeal returns us to further interpretation of the language of section 201–A, one aspect of which we discussed recently in State v. Farmer, Me., 324 A.2d 739 (1974). The Defendant contends that there is no violation of the statute unless it is alleged and proved that the weapon was a *loaded* firearm. The Defendant also requested instructions to this effect which were refused by the presiding Justice. The issue is clear.

The statute with which we are concerned is one of several enacted by the 105th Leg-

islature which provided for severe mandatory minimum sentences for persons committing certain offenses while "armed with a firearm".[2] Accompanying these new sections was P.L.1971 ch. 539 § 21(2) (which became 17 M.R.S.A. § 4001), which announced the meaning of the term "firearm" as the Legislature intended it:

> "2. Firearm. 'Firearm' shall include any pistol, revolver, rifle, shotgun, machinegun, automatic and semiautomatic rifle or other firearm as the term is commonly used, or any gun, device or instrument in the nature of a weapon from which may be fired or projected any solid projectile or slug, pellet, missile or bullet or any gas, vapor or other nocuous thing by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances; or any other instrument that has the appearance of a firearm even though not capable of discharging a projectile."

The Legislature had in mind three types of weapons. First, "real guns" of the conventional firearm type which discharged a projectile by means of the detonation of powder. Second, "real guns" with bizarre methods of discharging the projectile, or which discharge "gas, vapor or other nocuous thing" instead of a solid projectile. Third, instruments simulating guns.

In *Farmer* (which was decided subsequent to the trial now concerning us) we held that an indictment sufficiently charges an offense under section 201–A if it alleges that the Defendant committed the assault while "armed" with a firearm described as a "real gun" without any allegation that the firearm was *used* in the assault.[3] 324 A.2d at 743. In the meaning of section 201–A, the Court said, a person is "armed" if "he has in his possession or

---

**2.** Along with §§ 3 and 4 of P.L.1971 ch. 539, pertaining to Armed Assault and Battery, the Legislature also passed minimum sentencing provisions for the armed crimes of Abduction (§ 1), Arson (§ 2), Attempt (§ 5), Burglary (§§ 6, 7, 8), Escape (§§ 9, 10),

Indecent Liberties (§ 11), Kidnapping (§ 12), Manslaughter (§ 13), Mayhem (§§ 14, 15), Murder (§ 16), Rape and Carnal Knowledge (§§ 17, 18), and Robbery (§§ 19, 20).

**3.** *Farmer* restricted its holding to indictments relating to "real guns", as the legal effect

control a 'real gun' available for use, offensively or defensively, as a weapon." [4] Obviously, the Defendant was "armed", if this interpretation carries over into the area of loaded/unloaded firearms because the Defendant's unloaded firearm is an instrument "available for him to use, offensively or defensively, as a weapon". In fact, the Defendant made such use of it against the bartender.

Or did the Legislature intend "armed" to have a more restricted meaning in the context of loaded/unloaded, and concern itself here only with the availability for use of firearms which were proved to have been loaded? An unloaded firearm is nothing offensively or defensively but a club, the Defendant argues. He urges us that the Legislature would not have intended to single out possession of unloaded firearms for such severe treatment when other club-like weapons are equally dangerous.

The wide sweep of the Legislature's enlargement of punishment for crimes of violence by people armed with firearms leaves no doubt as to the belief of the Legislature that the possession of firearms by persons committing crimes greatly increases the threat to public safety. The Defendant argues that inclusion of unloaded firearms within the statute is "absurd" in that mere assault and battery becomes a felony by the chance possession of an unloaded gun. Given such an interpretation, the statute would be strict and the punishment for violation severe, but it would be anything but absurd.

We look to the familiar tests of statutory interpretation, namely, the language of the statute and the legislative history and debate.

The language of the statute itself does not suggest the limited application which the Defendant urges upon us. If the Legislature had intended to restrict the use of the statute to persons armed with *loaded* firearms, the Legislature could easily—and would we think—have added that word.

Further support for this conclusion is found in 17 M.R.S.A. § 4001 which defines "firearms" as including devices which are not even capable of discharging projectiles. Such broad, inclusive language may have been designed with an eye toward the victim, whose apprehension and response during the commission of an offense would be the same whether or not the apparent firearm could in fact function. The language might also have been designed with an eye toward prosecution and the obvious difficulties of trial proof when a victim is unable to say that the gun which he briefly glimpsed was a real gun, was loaded, was not defective and was not a convincing replica. The Legislature no doubt recognized that an unloaded firearm can be transformed in seconds into a loaded firearm by a desperate or enraged person. There seems to be no unreasonableness in the inclusive language chosen by the lawmakers, and, while we note there is no specific inclusion of unloaded firearms, we find the language strongly suggests such inclusion.

---

of an assaulter's being in possession or control of a *simulated* firearm which was not used was not before the Court then. Neither is it before us now.

4. In *Farmer* the defendant did use a loaded gun but the indictment did not charge either that it was loaded or that it was used.

In State v. Lynch, 88 Me. 195, 33 A. 978 (1895) the defendant was convicted of an Assault While Armed With a Dangerous Weapon. The indictment charged that the defendant assaulted the victim "with a deadly weapon, to-wit a loaded revolver in his right

hand he the said Charles Lynch then and there had and held." 88 Me. at 196, 33 A. at 978. The Court held that

" 'Armed' means furnished and equipped with weapons of offense or defense" (88 Me. at 198, 33 A. at 979).

and agreed with the State that a loaded revolver is a dangerous weapon and that a person who has a loaded revolver in his hand with which he makes an assault is "armed" with it within the meaning of the statute. We find no suggestion by the Court that a person would not be "armed" if the weapon was an *unloaded* revolver.

A study of the legislative history and debate concerning § 201–A shows that there was introduced at the 1969 Legislature an Act (L.D.1361) to Provide Mandatory Penalties for Commission of a Crime with a Dangerous Weapon. After considerable debate, much of which concerned its mandatory sentence features, the mandatory sentence provisions were deleted, its application was limited to *firearms*, and it was enacted in amended form reading:

> "Whoever shall commit a felony while carrying a firearm may, in addition to the sentence applicable to the felony, be punished by imprisonment for not more than 6 years." P.L.1969, ch. 418.

In 1971 a more comprehensive bill (L.D. 983) was introduced which would provide mandatory minimum confinement (plus increased maximums in some instances) for persons who committed various criminal offenses—including assault and battery—while armed with a *dangerous weapon*. Again the bill was amended to pertain only to firearms. This time the mandatory confinement provisions escaped deletion and the bill was enacted and became the statute with which we are now concerned.

A reading of the legislative debates in both 1969 and 1971[5] discloses a deep concern over the proliferation of offenses in which firearms were used and a belief that only a clear warning that drastic sanctions can be expected would have a sufficient deterring effect. The Defendant argues—with some logic—that the lawmakers' decision to confine the application of the statute to firearms (instead of including *all* dangerous weapons) is based upon the unique killing capacities of *loaded* guns and *indicates an intent to* include only loaded guns. However, we find no direct reference in debate to any distinction between loaded and unloaded firearms in either 1969 or 1971 and if such a limitation was intended by the Legislature, one would expect it would have entered into the extended debates at some point.

Instead, we believe the Legislature considered that all firearms in the hands of persons committing criminal conduct—even those which are at the moment unloaded—constitute a danger to public safety which requires drastic and broadly inclusive statutory treatment. We do not find the presiding Justice's interpretation of the statute unreasonable.

### Instruction as to Reasonable Doubt

The second contention by the Defendant is that the presiding Justice erred in his instruction defining the term "reasonable doubt". The Justice offered the following instruction:

> "The State has the burden of proof, and that burden is to prove the guilt of this defendant as charged beyond a reasonable doubt. This, as I have said to you, is not proof to a certainty, it is not proof beyond all doubt, but it is proof, it is a substantial burden that the State carries and must maintain to the point where each one of you are satisfied that each and every element involved in this offense has been proven *to a point where none of you have a doubt for which you can ascribe a reason.*
>
> Again, as I have on many occasions fully elaborated for all of you, what is meant by proof beyond a reasonable doubt. I have explained reasonable doubt to you on many occasions. I think by virtue of the conduct of the jury throughout the month that you have been here you have understood the importance of that requirement on the part of the State and I will not more fully explain to you what is meant by reasonable doubt unless I'm specifically requested to do so by counsel." (Emphasis supplied.)

At the close of instructions, counsel for the Defendant made objection to this in-

---

5. 2 Me.Leg.Rec.1969, 2113, 2231–35, 2377–81, 2754, 2865, 2960–70, 3938–45; 2 Me.Leg.Rec. 1971, 3225–31, 3308–12, 3774–75, 4301–02.

struction, saying that the court's definition of a "reasonable doubt" as "a doubt for which you can ascribe a reason" impliedly rules out doubt for which no reason can be ascribed or *articulated*. After taking note of this and other objections, the presiding Justice gave no further instructions to the jury and then ordered that the jury retire for its deliberations. The issue, properly objected to and preserved for appeal, is whether the instructions as given prejudiced Defendant's right to require the State to prove his guilt beyond a reasonable doubt—as that standard of proof is understood in criminal law.

This Court has discussed the meaning of reasonable doubt on several occasions, most recently in State v. McKeough, Me., 300 A.2d 755 (1973), and in State v. Carey, Me., 303 A.2d 446 (1973). We have rejected any formula definition in view of the difficulty of improving upon the simple meaning of the words themselves. In State v. Reed, 62 Me. 129, 142–143 (1874) we said:

"The explanations of the meaning of this phrase have been almost innumerable, and the best jurists have found it difficult to convey to their own satisfaction the idea in their own minds expressed by its use. Not that there is any considerable difficulty in understanding its meaning, but rather in not conveying it. It may indeed admit of grave doubt whether the proposition is in itself so simple and the words so well calculated to express a state of mind so easily felt, though difficult to describe, that in most cases it is sufficient to use the expression alone without any attempt at explanation. All such attempts must result in simply stating the same proposition in a different form of words, and words which are, perhaps, no more easily understood.

. . . The doubt, therefore, which conforms to the reason of the person examining, is to him a reasonable doubt."

Thus the instruction by the presiding Justice in the present case would be sufficient and correct unless his elaboration upon the meaning of reasonable doubt tended to lead the jury away from the intended legal conception of that phrase. The Justice said, in part, that reasonable doubt is "a doubt for which you can ascribe a reason." In State v. Merry, 136 Me. 243, 262, 8 A.2d 143, 153 (1939), we said:

"As the term is used in instructing juries in criminal cases, a reasonable doubt is not a vague, fanciful or speculative doubt, but a doubt arising out of the case as presented, for which some good reason may be given . . .."

■ More recently in State v. Poulin, Me., 277 A.2d 493, 496 (1973) we held that the statement by a presiding Justice that

"[a] reasonable doubt is a doubt for which one has a reason"

was a correct statement. But, of course, the "reason" is not expected to be mere whimsy or prejudice and we think the Justice's language here was intended to make this clear. There was no suggestion here that the juror's reason must be articulated to the other jurors. Instead, we believe it must have been evident to the jurors that the Justice was speaking of a doubt which had sufficient substance as to be understandable to the juror himself, as distinguished from preconceived suspicion or capricious scepticism.

The language of which the Defendant complains was not incorrect in itself and, looking at the instruction as a whole, we see no prejudice to the Defendant's cause.

### Evidence of Subsequent Events

Finally, the Defendant urges us that he was prejudiced by the admission, over the Defendant's objection, of evidence of events occuring after the Defendant had ceased to have possession of the gun. The Defendant asserts that testimony that the

Defendant then persisted in assaultive conduct directed toward the bartender had no relevance to the completed use and possession of the gun and could only prejudice the Defendant in the minds of the jury.

 We must remember that the State's burden was to prove that the Defendant's alleged striking the bartender was an intentional act and the Defendant, in assaulting the bartender, "intended to inflict some violence on the victim." State v. Worrey, Me., 322 A.2d 73, 80 (1974). In fact, the Defendant himself appears to claim that if it happened at all it was unintended.

The discretion of a presiding Justice to admit evidence of other facts happening before or after the transaction in issue if they tend to establish intent was recognized by this Court in State v. Smith, 140 Me. 255, 276, 37 A.2d 246, 255 (1944). Recently, in State v. Gordon, Me., 321 A.2d 352 (1974) a similar issue arose when, in a trial for robbery and assault with intent to kill (both allegedly committed while defendant was engaged in an escape from prison), evidence was admitted which revealed that, after completion of the acts which the State charged constituted the robbery and the assault, the defendant led the police on a high-speed pursuit through the streets of two cities. We found that materiality to the *animus furandi* of the robbery of the car and to the specific intent of the assault was revealed in the defendant's later conduct, since that conduct proved the defendant's overriding and desperate desire to avoid apprehension for his escape from custody in Vermont.

We said then that:

"The ruling of the presiding Justice was thus clearly within his proper discretion to admit evidence which had significant probative value on important issues of the case notwithstanding that it might also inject extraneous features potentially prejudicial to defendant." 321 A.2d at 367. *See* State v. Northup, 318 A.2d 489, 494 (1974).

Here, the testimony concerning events after Defendant lost control over his firearm, particularly Defendant's attempts to rip out the phone, to hit the bartender with the deep fat fryer basket, and to break a beer bottle for hostile use, all tend to establish the element of intent in Defendant's alleged criminal act of Armed Assault and Battery under 17 M.R.S.A. § 201–A.

The testimony was relevant and the presiding Justice did not abuse his discretion in admitting it.

The entry is:

Appeal denied.

All Justices concurring.