**STATE of Maine**

v.

**Frank A. CUGLIATA and John Moraites.**

Supreme Judicial Court of Maine.

April 20, 1977.

---

John R. Atwood, Fernand R. LaRochelle, Asst. Attys. Gen., Augusta, for plaintiff.

Fitzgerald, Donovan & Conley by Daniel R. Donovan, Duane D. Fitzgerald, Fitzgerald, Donovan & Conley, Bath, Manuel Katz, Gerald Alch, Boston, Mass., for defendants.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

WERNICK, Justice.

In a consolidated trial in the Superior Court (Lincoln County) the jury, on March 15, 1975, found defendant Frank Cugliata and defendant John Moraites guilty, as charged by indictment, of felonious homicide punishable as murder (17 M.R.S.A. § 2651). Each defendant has appealed from the judgment of conviction entered against him.

We deny the appeals.

I

The nature of the points raised on appeal requires an extensive statement of the factual findings warranted by the evidence.

On Thursday morning August 15, 1974, at approximately 6:00 a. m., the dead body of Vincent Serra of Medford, Massachusetts was discovered in the easterly vicinity of the northbound lane of Route 1 in Nobleboro. Multiple wounds inflicted by shotgun pellets and nine millimeter bullets fired by two different firearms had caused the death which had occurred sometime between 11:00 p. m. August 14 and 3:00 a. m. August 15.

On August 14, in the morning, Serra had driven Albert Wilson, a long-time next-door neighbor and friend, to the Medford Savings Bank. There, Wilson withdrew $1,200 and gave it to Serra to assist Serra in a project to purchase, with two other persons, 10 pounds of hashish at a location approximately an hour and a half, by automobile, from Medford. Returning to Wilson's home, Serra drove along Boston Avenue in Medford and looked twice at a building bearing number 305 where defendant Moraites lived. Sometime the same day Serra withdrew $800 from the Medford Savings Bank. During the afternoon Serra was at the home of defendant Moraites. At 6:20 in the evening Wilson stopped by Serra's house and there wished Serra luck on his upcoming trip. Shortly before midnight Wilson again drove by the Serra residence and observed that Serra's car was parked nearby.

At approximately 1:30 a. m. August 15 Clifford Colson was driving a tractor-trailer south on Route 1 in Nobleboro, Maine. He observed a car parked on the shoulder of the northbound lane, facing north, with its high beam lights on. Colson dimmed his own headlights, but the operator of the parked vehicle did not reciprocate. After he had passed the parked vehicle, Colson looked in his rear view mirror. He saw the silhouettes of two people and four rapid flashes of light resembling gunshots.

A few minutes later a car passed Colson's truck from behind. Believing the passing vehicle to be the one he had just seen parked on the shoulder of the road and thinking that what he had seen in his rear view mirror was night hunting, Colson wrote down on a scratch pad the license plate number of the vehicle, 37H360. He also noted that the number appeared as red figures on a white background. The incident witnessed by Colson occurred at a location matching that at which Serra's body was found a few hours later.

On August 16, 1974 Colson reported the license plate number to the Maine State Police. The police traced it to a vehicle registered to defendant Frank Cugliata. On Sunday, August 18, State Police Detective Dale Ames and a Lincoln County Sheriff went to Massachusetts to conduct a further investigation. Accompanied by Ser-

geant Joseph Littlewood of the Malden Police Department, they first went to Cugliata's home in Malden where they observed a parked green Mercury Cougar bearing a white Massachusetts license plate with the red number 37H360. Cugliata invited the officers into the house. When Sgt. Littlewood showed Cugliata a photograph of Serra and asked if he knew the person in the picture, Cugliata said that it was "Vince Serra", adding that while he hardly knew Serra, John Moraites knew him better and possibly could be of more assistance.

Questioned about the green Mercury Cougar, Cugliata stated that it was his, it had not been stolen recently, and since the summer of 1973 it had not been in Maine. Cugliata authorized the officers to search the Cougar. In the back seat area the police found a road atlas containing a map of Maine marked by two red lines—one from Kittery to Houlton via Interstate 95 and the other from Kittery to Calais via Route 1.

Later that same day Ames and various Massachusetts police officers made contact with defendant John Moraites. They spoke with him and his parents at the Medford police station. Moraites identified the person in the photograph as Vincent Serra. Moraites' mother stated that her son had gone out on the night of Wednesday, August 14 and had not returned until between 4:00 and 4:30 a. m. the following morning. Moraites himself claimed that he had ridden in defendant Cugliata's green Mercury Cougar to Cugliata's house in Malden and there played cards and watched television until long past midnight.

Defendants Cugliata and Moraites met during the interval between the time the police talked with Cugliata and their later interview with the Moraites family. At their meeting, as Moraites subsequently told both Detective Ames and Sgt. Littlewood, no mention was made by either Cugliata or Moraites about Serra's death or the police visit to the Cugliata residence. At another time, however, Moraites contradicted this by admitting to Littlewood that Cugliata had mentioned Serra's death.

On August 20, Serra's car, reported stolen, was recovered by the Somerville, Massachusetts Police Department. Examining the car in Somerville, Massachusetts State Police Officer Robert Bidder found a note on the driver's seat in Serra's handwriting. The note (more fully discussed infra) mentioned the names of defendants, misspelling each name in a manner matching the spelling used by Serra in entries made in Serra's handwriting in his personal address book.

On August 24, defendant Moraites attended a large party on George's Island in Boston Harbor. Also present were Paul Costa and Joseph Melle, friends of Serra and both defendants. In the presence of several bystanders Costa accused Moraites of murdering Serra, and this angered Moraites. Attempting to ameliorate the situation, Melle took Costa and Moraites away from the group. Moraites then complained that Costa should not have accused him in front of other people and added a statement which was either, "You don't know what happened", or "If you don't know what happened." Costa apologized for having made the statement in the presence of others, but he refused to "take back what . . . [he had] said." Costa and Moraites then shook hands and returned to the party.

Defendants were last seen in Massachusetts on August 14 at 9:00 p. m. when they were at the Medford residence of Cugliata's mother. They were then in a hurry, having stopped so that Cugliata could use his mother's bathroom. Defendants were not again seen in Massachusetts until after 3:00 a. m., August 15.

At approximately 10:45 the night of August 14, Robert Scarpaci, Cugliata's upstairs neighbor and landlord, drove up to their Malden residence. He noticed the absence of Cugliata's green Mercury Cougar. Responding to a friend's telephone call, at approximately 2:45 a. m., Scarpaci went down to the front porch and again observed the absence of Cugliata's car. At about 3:15 or 3:30 a female friend of Scarpaci drove up. Scarpaci talked to her in front of the house, and at this time he observed

Cugliata's car drive by with two people in it. Moraites arrived at his own home in Medford between 4:00 and 4:30 a. m.

## II

One of defendants' contentions on appeal is that they were erroneously denied access to the transcript of proceedings before the Grand Jury.

On December 19, 1974 defendants had moved, pursuant to Rule 6(d) M.R.Crim.P., that the Grand Jury proceedings be transcribed by an official court reporter. The presiding Justice granted the motion, ordering that the resulting transcript be impounded subject to future order of disclosure. After return of indictments against both defendants on December 20, 1974, defendant Moraites filed, on December 27, 1974, a motion for "Leave to Inspect Grand Jury Minutes Prior to Trial." Moraites further moved, separately, for discovery under Rule 16(a) M.R.Crim.P. and Cugliata moved, likewise pursuant to Rule 16(a), for discovery of several items allegedly within the custody of the State, including the Grand Jury transcript.

Granting all motions for discovery, the presiding Justice refused to allow defendants wholesale inspection, before trial, of the Grand Jury testimony. He ruled, instead, that the transcript would continue impounded pending specific requests concerning testimony at trial but, upon such a request as to a particular witness, the Justice would himself inspect the relevant Grand Jury testimony and, should he discover inconsistent statements, he would then release it to defense counsel. On one occasion (involving witness Robert Scarpaci) this procedure apparently resulted in defense access to the Grand Jury transcript. On another (as to witness Clifford Colson), it did not.

Defendants maintain that the presiding Justice committed error (1) by denying inspection of the entire transcript before trial without a showing of "particularized need", and (2) by refusing to permit defendants access during trial to the specific testimony of Clifford Colson.

We note, to pass beyond, a procedural argument of the State:—that by resort to motions for discovery pursuant to Rule 16(a) M.R.Crim.P., defendants were not entitled to obtain access to an impounded transcript not "within the possession, custody, or control of the State." *State v. Burnham*, Me., 350 A.2d 577 (1976); *State v. Emery*, Me., 304 A.2d 908 (1973). This contention misses the mark because some of defendants' requests for the Grand Jury testimony were by motions other than those seeking discovery of material in State custody. In addition to the December 27, 1974 motion by defendant Moraites "For Leave to Inspect Grand Jury Minutes Prior to Trial", both defendants submitted subsequent motions, also before trial, to the same effect. These motions were addressed to the court's power to reveal material in its control.

We turn to defendants' contention that regardless of "particularized need", they should have been afforded pre-trial disclosure of the entire transcript produced by witnesses expected to be called at trial.

Conceding that this Court has required "particularized need" to invade Grand Jury secrecy, *State v. Levesque*, Me., 281 A.2d 570 (1971), defendants rely on a modern trend which seems to favor, without necessity for a showing of particularized need, pre-trial access by defense counsel to the Grand Jury testimony of trial witnesses. See, e. g., A.B.A. Standards Relating to Discovery and Procedure Before Trial § 2.1(a)(iii) Approved Draft, (1970);[1] *United States v. Youngblood*, 379 F.2d 365 (2d Cir. 1967); *United States v. Amabile*, 395

---

**1.** That section provides:

"2.1 Prosecutor's obligations.

"(a) Except as is otherwise provided . . . the prosecuting attorney shall disclose to defense counsel the following material and information within his possession or control:

\* \* \* \* \* \*

"(iii) those portions of grand jury minutes containing testimony of the accused and relevant testimony of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial."

F.2d 47 (7th Cir. 1968). Additionally, defendants assert that by the very terms of Rule 16(a) they need show only that: (1) the transcript "may be material to the preparation of . . . [their] defense", and (2) their request for it is "reasonable."

*State v. Levesque,* supra, belies the validity of interpreting Rule 16(a) to dispense with the requirement of a showing of "particularized need." In *Levesque* we reaffirmed our traditional regard for Grand Jury secrecy notwithstanding that Rule 16(a) then provided, as it does today, for discovery of Grand Jury testimony. (p. 572 of 281 A.2d)

■ Moreover, a request for discovery of admittedly relevant items is not "reasonable" *if* "strong public policies weigh against disclosure." *United States v. Procter & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958). See also: *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In the case of Grand Jury materials, strong and longstanding public policies of this State have tipped the balance against free access. *State v. Levesque,* supra.

■ We therefore read Rule 16(a) as incorporating the traditional "particularized need" requirement in regard to disclosure of Grand Jury transcripts.

■ We also refuse to modify the doctrine reaffirmed in *Levesque* favoring Grand Jury secrecy.

■ Defendants cite *Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), as evidence of the United States Supreme Court's adherence to the trend away from suppression. However, in *Dennis* the Supreme Court did not dispense with the requirement of "particularized need;" [2] it found only that the defendant had made the requisite showing and ordered that the resulting disclosure be made to counsel rather than to the trial judge.

Further, defendant in that case urged no wholesale discovery of the entire transcript before trial. Instead, he sought, at trial, the testimony of only four key witnesses based on pre-trial and trial factors demonstrating particularized need. See also: *United States v. Procter & Gamble Co.,* supra.

The A.B.A. Standards Relating to Discovery and Procedure Before Trial do not persuade us to accept the procedure urged by defendants. The Commentary to those Standards, at pp. 64–65, concedes that most jurisdictions still adhere to our traditional doctrine favoring secrecy. More important, the Standards suggest no requirement that transcription occur in the first instance, thereby rendering free disclosure theoretical in the many cases in which there is no transcript.

■ We thus find no error in the presiding Justice's decision to inspect the transcript only upon specific request, and defendants do not contend that any such request was refused. Cf. *Dennis v. United States,* supra. Similarly, the Justice's determination to confine that inspection to himself was within permissible discretion and promoted our still viable interest in secrecy.

■ We turn, then, to defendants' complaint that the presiding Justice erred in refusing disclosure to defense counsel of the Grand Jury testimony of the witness Clifford Colson. In light of our approval of the general procedure adopted by the presiding Justice, the only ground of error in this particular instance must be found in the Justice's refusal to look upon the discrepancies between Colson's trial and Grand Jury testimony as sufficient to show "particularized need" for release of the Grand Jury version for purposes of impeachment. We have carefully compared Colson's testimony before the Grand Jury with that at trial and discover no inconsistency warranting a

---

2. The views of the Supreme Court of the United States in *Dennis* concerning defense access to Grand Jury testimony, based on its supervisory authority over the lower federal courts rather than on constitutional grounds, do not

bind this or any other State Court. This Court has rejected the claim that there is a right, under either the United States or Maine Constitution, to Grand Jury testimony. *State v. Levesque,* Me., 281 A.2d 570 (1971).

conclusion that the presiding Justice had committed error.

### III

Another of defendants' claims—and perhaps their most important contention on appeal—relates to the admissibility in evidence of (1) the testimony by Albert Wilson narrating his conversation with Serra on August 12, a few days before Serra's body was found in Nobleboro; and (2) the note left by Serra in his automobile.

According to Wilson, Serra told him that Serra was planning to buy 10 pounds of hashish at midnight, August 14, at a place which was near a ship and was approximately a drive of an hour and a half, by automobile, from Medford. Serra added that two other people, one of whom was named "Frank" and both of whom would be armed, were to accompany Serra. Each of the three was to contribute $2,000 toward the $6,000 purchase price of hashish. Serra told Wilson about this plan because Serra was unable to raise his $2,000 share and wanted Wilson to become a participant by providing some of that amount of money. When Wilson agreed to become a participant, he and Serra went to the Medford Savings Bank where Wilson withdrew $1,200 and gave it to Serra (Serra, as previously mentioned, later withdrawing $800 of his savings to make up the $2,000).

Wilson's proffered testimony was first submitted to the presiding Justice in the absence of the jury. At that time both defendants objected that it was inadmissible hearsay under the Maine law of evidence as well as by virtue of the rights of confrontation guaranteed defendants by the 6th-14th Amendments to the Constitution of the United States. Defendant Cugliata made the further claim that should the proffered testimony be held admissible, the Court delete the mention of the name "Frank."

The presiding Justice ruled the entirety of the conversation admissible, including the reference by Serra that one of his companions was a person named "Frank." However, before Wilson was permitted to give his testimony to the jury, the presiding Justice instructed the jury that Serra's statements to Wilson were to be considered as evidence subject to the following limitations:

> "[T]he only thing . . . [the statement] will establish for you would be that there existed, if in fact you find that it does establish that, an intention in the mind of the decedent to make a trip, and also as bearing upon whether or not in fact he did make such a trip. But for no other reason, for no other purpose will you receive this testimony or give it any application."

The presiding Justice repeated this instruction in his final charge to the jury.

The note left by Serra in his automobile read in its entirety:

> "Split with John Meraides [or Miraides] and Frank Cogliata at 9:00 PM 14th of August. In case of no return check them for responsibility carrying $2000.00." (emphasis supplied)

As allowed in evidence by the presiding Justice, the note was edited so that only the portion above underscored came to the attention of the jury. Defendants objected to the admissibility of the edited version of the note on grounds of inadmissible hearsay under the law of Maine and violation of the defendants' rights of confrontation guaranteed by the 6th–14th Amendments to the Constitution of the United States. Before the jury was permitted to learn of the contents of the note, as edited, the presiding Justice gave the jury limiting instructions paralleling those he had given prior to admitting Wilson's testimony:—the jury was to consider the note only as evidence of Serra's intent to take a trip and of the likelihood that he in fact took the trip he intended to take. This point was re-emphasized in the presiding Justice's final charge to the jury.

### III–A

We consider first the arguments against admissibility predicated on the Maine law of evidence.

Defendants assert that as applicable to this criminal prosecution, the Maine law of evidence recognized only two exceptions to the rule excluding hearsay, *viz.*, a dying declaration and statements within the *res gestae, State v. Chaplin*, Me., 286 A.2d 325 (1972); *State v. Lafferty*, Me., 309 A.2d 647 (1973). Arguing that the note and statement to Wilson fit neither of those exceptions, defendants maintain that both should have been excluded as hearsay.

Conceding that the evidence in question was not within the dying declaration or *res gestae* exception to the general rule of evidence excluding hearsay, the State argues that the conversation and the note were admissible as statements of Serra's present intention to do a future act. Relying on the leading case of *Mutual Life Insurance Company v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), the State contends that such evidence falls within a generally recognized exception to the hearsay exclusionary rule, and the exception has been preserved by the Maine Rules of Evidence as Rule 803(3).[3] While this Court has not previously had occasion to advert to this "present mental state" hearsay exception as applicable in a criminal prosecution, the State maintains that it has been part of the Maine law of evidence, as indicated more particularly by the promulgation of Rule of Evidence 803(3) approving *Hillmon*.

■ We agree with the State's position that Maine law has recognized a "present mental state" exception to the hearsay rule as applicable in criminal prosecutions, along the lines discussed by the Supreme Court of the United States in *Hillmon* and as acknowledged, and continued in effect, by Rule 803(3) M.R.Evid. See: Advisers' Note to Rule 803(3) M.R.Evid., Field and Murray, Maine Evidence § 803.3, pp. 211–213 (1976);

*State v. Burnham*, Me., 350 A.2d 577, 580 (1976).

In the cases in which we have had opportunity to deal expressly with the "present mental state" hearsay exception in civil contexts *Kennard v. Burton*, 25 Me. 39 (1845); *Colby v. Tarr*, 139 Me. 277, 29 A.2d 749 (1943) we have never intimated that the applicability of the exception is confined to civil trials. Similarly, in the context of our rule-making power, we have not seen fit to differentiate the treatment of hearsay questions as between criminal and civil trials.

■ The admissibility in criminal prosecutions of hearsay evidence as to "present state of mind" has been recognized by the overwhelming majority of courts in other jurisdictions. *People v. Alcalde*, 24 Cal.2d 177, 148 P.2d 627 (1944); *Commonwealth v. Trefethen*, 157 Mass. 180, 31 N.E. 961 (1892); see appropriate cases catalogued in VI Wigmore on Evidence (3d ed.) § 1725, p. 129 et seq. Cf. *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933) (present mental state caused by *past* events inadmissible).[4]

We now decide that the "present mental state" hearsay exception has been applicable in criminal prosecutions in this State tried prior to adoption of the (currently effective) Maine Rules of Evidence.

This decision, however, does not fully resolve the present issue. In *Hillmon* recognition of a "state of mind" hearsay exception was qualified to the extent that in that case the hearsay evidence as to state of mind was highly relevant and uttered in circumstances indicating its truthfulness above and beyond the reliability presumed of all statements of present mental state.[5]

---

3. The Maine Rules of Evidence, effective February 2, 1976, did not govern defendants' trial which was held in March, 1975.

4. We find without merit defendants' attempted characterization of the statements and note as recitations of past events. While there are minor references therein to the past, the assertions in essence look forward rather than back. *United States v. Annunziato*, 293 F.2d 373 (2d

Cir. 1961); cf. *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

5. The Supreme Court also noted that the preservation of the statements in written form (letters) added to their weight since there was no possibility of memory lapse on the part of the hearer of oral assertions. (p. 295 of 145 U.S., 12 S.Ct. 909.)

See also: *Hunter v. State*, 40 N.J.L. 495, 538 (1878); Wigmore, supra, § 1725. Defendants maintain that the hearsay evidence here admitted to prove state of mind did not contain the special guarantee of reliability present in *Hillmon*. In their view, both the statements to Wilson and the note constituted suspicious assertions designed to "finger" defendants by one involved in a drug conspiracy.

We disagree.

It is true that the letters in the *Hillmon* case were the "natural" communication of a man to his family of plans for an apparently legitimate business trip. See also: *Hunter v. State*, supra. Although the declarations before us are different in some aspects, the differences themselves provide indicia of reliability additional to those inherent in assertions of present mental condition.

The persons to whom Serra related his plans were plainly similar to the letter recipient in *Hillmon*. Albert Wilson was a lifelong friend, making it unlikely Serra would lie to him. True, the note was addressed to no-one in particular, but it is reasonable to assume Serra expected it to inform his family of his whereabouts, just as did the declarants in *Hillmon* and *Hunter*. And, like the communications in *Hillmon* and *Hunter*, Serra's statements concerned future travel plans. Serra's unavailability as a witness also parallels those cases and accentuates the necessity for admission of the hearsay there recognized. See also: *Commonwealth v. Trefethen*, supra, p. 194 of 157 Mass., 31 N.E. 961.

Unlike the declarant in those cases, the declarant Serra, here, was involved in a criminal conspiracy. We conclude, however, that the illicit nature of the asserted plan adds to the declarant's credibility for the reasons underlying admissibility of statements of co-conspirators and declarations against penal interest. *State v. Vetrano*, 121 Me. 368, 117 A. 460 (1922), Rule 801(d)(2)(E) M.R.Evid., *State v. O'Clair*, Me., 292 A.2d 186, 195 (1972), *State v. Gervais*, Me., 317 A.2d 796 (1974), Rule 804(b)(3) M.R.Evid. That is, it is usually unlikely that one will fabricate himself into criminal liability.

We emphasize that our reference here to hearsay exceptions concerning co-conspirators and declarations against penal interest in no way indicates our belief that these statements fit either of those special exceptions. They do not. Rather, we merely consider the presence here of some of the elements of those exceptions as added indicia of the reliability of hearsay admissible under another exception. *United States v. Annunziato*, 293 F.2d 373, 378 (2d Cir. 1961). See also: *United States v. Iaconetti*, 540 F.2d 574 (2d Cir. 1976); *cert. den.* —— U.S. ——, 97 S.Ct. 739, 51 L.Ed.2d 752 (1977); *State v. Phillips*, 68 N.D. 113, 277 N.W. 609 (1938); *United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976); VI Wigmore, supra, § 1725, p. 139.

Lastly, we find no specific indication that Serra's declarations were not truthful. Instead, we find abundant corroboration that his plan was real and, in fact, carried out.

■ First, the statements to Wilson and the information in the note were totally consistent with each other. Both mention traveling late on August 14; both name $2,000 as Serra's stake in the venture;[6] both contemplate participation of two other people including one named "Frank."

Second, evidence independent of the hearsay corroborated its accuracy. Serra did in fact obtain $2,000 in cash on the day of August 14. He was in personal contact with John Moraites that afternoon. He was not at home that evening and was eventually found dead, near the Maine coast. Death resulted from shots fired by two different weapons.

■ We therefore conclude that no circumstances here surrounding either the conversation with Wilson or the writing of

---

**6.** Although the note in the edited form submitted to the jury did not contain the reference to $2,000, the presiding Justice was free to consider deleted portions in his determination of admissibility.

the note negated their admissibility in evidence within the scope of the "present mental state" exception to the hearsay rule of exclusion.

We address a second difficulty arising because of the instructions given by the presiding Justice purporting to limit the extent to which the Wilson conversation with Serra and the Serra note were to be considered as evidence. As previously mentioned, the presiding Justice limited the jury's consideration of this evidence strictly to the issue of whether Serra planned to take a trip and in fact acted as he had planned. Yet, while imposing this restriction, the presiding Justice allowed the jury to learn that two other people, one named "Frank" and both armed, were going to take the trip with Serra and, further, that two persons identified as having the misspelled names of the defendants were those with whom Serra had "[s]plit . . . at 9:00 PM 14th of August."

Defendants assert that by these actions, the presiding Justice made it inevitable that the jury would act in a manner improperly prejudicing defendants. In the face of what the jury heard, defendants maintain that it was beyond the jury's capability, as lay persons, to confine their considerations strictly to Serra and Serra's actions and to ignore the much more cogent and material portions of the evidence tending to show conduct of the defendants, i. e., that defendants would accompany Serra on the trip.

Defendants also complain that by allowing Wilson to testify about that part of his conversation with Serra which mentioned the purpose of the project of Serra and the other two as being the purchase of 10 pounds of hashish, the presiding Justice caused undue prejudice to the defendants by exposing them to the danger that the jury would more easily find them guilty of the charges against them because it had learned that they were involved in another type of criminal activity.

■■■■ As to the first of these two claims by defendants, a similar issue was present in *Mutual Life Insurance Company v. Hillmon*, supra, and was there resolved adversely to the position here taken by defendants. The *Hillmon* Court conceived the scope of the "present state of mind" hearsay exception as broad enough to encompass the admissibility of so much of the declarant's plan to take future action as included the involvement of other persons in the plan.[7] Other courts considering the issue have agreed with *Hillmon*. See: *State v. Phillips*, supra; *People v. Alcalde*, supra; *People v. Pearl*, 211 Cal.App.2d 783, 27 Cal.Rptr. 664 (1963).[8] Thus, defendants can gain nothing in this regard. The law did not require the limitations imposed by the presiding Justice and, therefore, any harm resulting to defendants because the jury might be unable to comply with the limited instruction would not be a legally impermissible form of prejudice.

■■■■ We turn to defendants' other claim that they were impermissably prejudiced because the presiding Justice did not exclude the references in the Wilson testimony to the criminal conspiracy to purchase hashish.[9]

Although the crime thus brought to the attention of the jury was different from the crime charged against defendants, evidence which is probative does not become inadmissible merely because it may also tend to show that defendants committed a separate

---

**7.** At pp. 212, 213 of Field and Murray, Maine Evidence, there is an enlightening discussion of this aspect of the decision in *Hillmon*.

**8.** At trial neither defendant made special objection to the inclusion in Wilson's narration of his conversation with Serra that Serra had mentioned that the two people who would accompany him would be armed. If, therefore, the conversation was otherwise admissible, the inclusion of the reference to arms could be a

ground for reversal of the conviction only on a manifest error-serious injustice approach:— whether defendants were thereby deprived of a fair trial. We find no such basis for reversal.

**9.** The record does not reveal whether defendants asked for excision of the information as to what was to be bought that night. We therefore do not consider whether such editing would have been required if requested.

offense. *State v. Gagne*, Me., 343 A.2d 186, 195–196 (1975); *United States v. Annunziato*, supra; *State v. Phillips*, supra. We have not previously, and will not now, announce as a per se rule deriving from human fallibility that, notwithstanding proper instructions, it is expecting too much of a jury to believe that they can act conscientiously and resist temptation to find defendants guilty of society's most serious criminal charge because the jury has learned that defendants had been involved in another, less serious, offense. *State v. Trask*, Me., 223 A.2d 823, 827 (1966).

### III–B

■ We also conclude that the admission in evidence of the Serra conversation with Wilson and the edited version of the Serra note did not violate the confrontation rights of defendants as guaranteed by the 6th-14th Amendments to the Constitution of the United States.[10]

■ The constitutional right of an accused to confront the witnesses against him does not require that otherwise admissible hearsay be excluded. *Dutton v. Evans*, 400 U.S. 74, 80, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *United States v. Clayton*, 450 F.2d 16 (1st Cir. 1971); *Ottomano v. United States*, 468 F.2d 269 (1st Cir. 1972), *cert. den.* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973).

In *Dutton*, which held the introduction of certain hearsay otherwise admissible under Georgia law consistent with federal constitutional requirements, the Supreme Court listed the several factors pertinent to its conclusion: (1) the statements were admissible under a long-established exception to the hearsay rule (admission of a co-conspir-

ator); (2) they were not crucial to the state's case;[11] (3) there was no indication that the admissions were coerced; (4) being but one statement, the evidence did not result in wholesale denial of cross-examination of a witness;[12] (5) defendant could have subpoenaed the declarant; and (6) circumstances surrounding the declarations showed they were reliable.

■ We turn to the hearsay before us in light of these factors, noting preliminarily that we do not read *Dutton* to mandate the presence of all of them as the pre-condition of constitutionality. *Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *United States v. Puco*, 476 F.2d 1099 (2d Cir. 1973) *cert. den.* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973); *United States v. Clayton*, supra. Instead, we focus primarily on whether circumstances surrounding the hearsay provided sufficient information to the jury to assess its reliability. *Mancusi v. Stubbs*, supra, p. 213 of 408 U.S., 92 S.Ct. 2308.

We start by listing those *Dutton* factors here present.

First, statements concerning present mental or physical state have long been generally admissible in this State. *Kennard v. Burton*, 25 Me. 39 (1845). While this Court has never had occasion to approve that exception in connection with the further inference that present plans were carried out in the future, courts in other jurisdictions had been admitting such hearsay evidence even before the (1892) *Hillmon* case. *State v. Howard*, 32 Vt. 380 (1859); *Hunter v. State*, 40 N.J.L. 495 (1878); *State v. Smith*, 49 Conn. 376 (1881); see also: aftermath cases catalogued at § 1725, p. 129 et seq., of Wigmore, supra.

---

**10.** Nor do we discern violation of Article I § 6 of our own Constitution, as asserted by defendants for the first time on appeal.

**11.** Another participant in the murder, under benefit of immunity, described the crime in great detail. Justice Blackmun therefore concurred in the plurality opinion on grounds of harmless error. *Dutton v. Evans*, 400 U.S. 74, 90, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), (Blackmun, J., concurring).

**12.** Cf. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Berger v. California*, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969). But see: *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972).

Second, as in *Dutton*, there is no indication that Serra's statements were coerced and it is, indeed, difficult to imagine how or why they could have been.

Third, the statements to Wilson and the note did not amount to a transcript of the testimony of an available witness never subjected to cross-examination. Cf. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

Fourth, as fully set forth in our examination of this evidence for purposes of hearsay issues, the circumstances surrounding, and following, Serra's assertions corroborated their reliability.

We think that the absence, here, of some *Dutton* factors was outweighed by the presence of the similarities above mentioned.

 It is true that the hearsay before us was important to the State's case, but the relative importance of the evidence does not *per se* render it inadmissible under 6th–14th Amendment principles. *United States v. Puco*, supra, at 1104, *United States v. Clayton*, supra, at 20. It is also true that defendants here cannot be faulted for their failure to summon the unavailable declarant. Yet, it would be far-fetched to view *Dutton* as precluding the introduction of hearsay whenever the declarant is unavailable. The Supreme Court itself has not so decided. *Mancusi v. Stubbs*, supra; see also *Pointer v. Texas*, 380 U.S. 400, 407, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Court's point in *Dutton* about declarant's availability went to defendant's ability to complain of circumstances in which he acquiesced. Additionally, this is not a case where we can attribute the declarant's absence to prosecutorial bad faith. Cf. *Barber v. Page*, supra.

Finally, we advert to differences here which favor admissibility.

The contested statement in *Dutton* was ambiguous. The declarant said:

"If it hadn't been for that dirty son-of-a-bitch . . . [defendant], we wouldn't be in this now." (p. 77 of 400 U.S., p. 214 of 91 S.Ct.)

In contrast, Serra's assertions were clear, thus reducing the need to cross-examine in order to pinpoint his meaning. *United States v. Puco*, supra. Further, Serra's declarations concerned a future project rather than past events and were, therefore, more reliable. *Shepard v. United States*, supra.

The case of *Favre v. Henderson*, 464 F.2d 359 (5th Cir. 1972), urged by defendants as dispositive of these issues in their favor, is readily distinguishable. In *Favre* the statements were vague and concerned past events. There was no evidence of circumstances surrounding the utterances which would indicate reliability. In fact, it was unclear whether declarants even had personal knowledge of the content of their assertions.

We are satisfied that the evidence here both afforded the jury an adequate basis upon which to evaluate the truth of the hearsay and provided indicia of its reliability. The contested admission of the hearsay therefore did not deny defendants their rights under the 6th–14th Amendments. *Mancusi v. Stubbs*, supra; *United States v. Puco*, supra; *United States v. Clayton*, supra.

IV

Defendants' attack on the sufficiency of the evidence, based on the allegedly improper admission of Albert Wilson's testimony and the Serra note, loses its force in light of our determination that introduction of, and inferences based upon, the hearsay were proper.

In addition to the evidence already catalogued placing defendants with Serra in Nobleboro, Maine on the night Serra was shot, we advert to the actions of defendants after those events.

 Moraites uttered contradictory statements about whether he discussed Serra's death with Cugliata on Sunday, August 18. The jury could also have found that he failed to deny Paul Costa's accusations at the George's Island party on August 24, thereby admitting them by silence. Cugliata told police his car had remained at his Malden residence the entire evening, yet his

neighbor Scarpaci did not see the usually present vehicle until it appeared after 3:00 in the morning and did not stop. Perhaps more important, Cugliata indicated that he barely knew Serra when mutual friends characterized Serra as more than a remote acquaintance. While Cugliata's mother testified that she reached Cugliata by phone at his home at 10:15 on the critical evening of August 14, the jury may well have concluded that she lied out of maternal loyalty. Finally, since Moraites' statements to police indicated that he and Cugliata spent the crucial period of time with Cugliata's wife Karen, the jury could have properly inferred that Karen Cugliata would have testified otherwise, in light of defendants' failure to call her as a witness. *State v. Bey*, Me., 342 A.2d 292, 298 (1975).

The evidence was sufficient to support the jury's verdict that each defendant was guilty as charged.

### V

Defendants also assign error in the presiding Justice's instructions concerning the presumption of innocence, the burden of proof and the meaning of "reasonable doubt."

### V–A

 Defendants claim that the presiding Justice "watered down" the presumption of innocence by instructing as follows:

"[Early Americans] . . . weren't concerned about protecting the guilty. No society, certainly not that society nor our society today . . . is concerned about the protection of the guilty. But I'm sure that they were concerned about the protection of the innocent . . ..

"[T]hey devised this system that said, to protect those that are innocent let's presume the person who is placed on trial is innocent. . . . If they could have devised a method whereby the presumption of innocence could only be attached to those who were really innocent I'm sure they would have done it. . . .

And they very soon found, I'm sure, that it was impossible to attempt to separate at that stage those who were guilty, . . . and those who were innocent. And so of necessity it had to be applied to all, and it was applied to all. For only in that way, Ladies and Gentlemen may the innocent be protected. . . . [I]f we do protect those who are guilty, then that's the price we pay for a system that protects and seeks to protect, and fully protects those who are innocent.

"[T]his principle seeks to protect those who are innocent but in order to do that you must and will apply it to everyone. These defendants certainly are entitled to that protection."

By objection after the conclusion of the charge defendants preserved this issue for our review.

We find no error.

We discern no attempt by the presiding Justice to "water down" the presumption of innocence accorded all criminal defendants. On the contrary, he was engaged in an endeavor to explain the historic roots of the presumption so that the jurors "might better understand why these principles exist today." With knowledge of the origins of, and reasons for, the presumption the jurors could be expected to give plenary force to it. The Justice never said that the presumption did not apply to the guilty, cf. *Gomila v. United States*, 146 F.2d 372, 373 (5th Cir. 1944), and he did not imply that these particular defendants were not entitled to the presumption. In addition to the language extracted by defendants, he said:

"It's the only protection you have, Mr. Foreman, or I have, *or these defendants have* . . ..

"So you have to understand, and recognize, and accept the fact that we seek here, and this principle seeks to protect those who are innocent but in order to do that you must and will apply it to everyone. *These defendants are entitled to that protection.*

"The fact that they were arrested at one point of time is not evidence of guilt." (emphasis supplied)

Further, the Justice's frequent references to the State's heavy burden of proof em-

phasized that defendants were to be acquitted unless that burden was met. *Moffitt v. United States*, 154 F.2d 402, 404–405 (10th Cir. 1946), *cert. den.*, 328 U.S. 853, 66 S.Ct. 1343, 90 L.Ed. 1625 (1946); *United States v. Farina*, 184 F.2d 18, 20–21 (2d Cir. 1950), *cert. den.* 340 U.S. 875, 71 S.Ct. 121, 95 L.Ed. 636 (1950).

Defendants take nothing by their citation of *Reynolds v. United States*, 238 F.2d 460, 16 Alaska 502 (9th Cir. 1956). In that case the Ninth Circuit took the minority view that it was error to instruct that the presumption of innocence was not intended to prevent conviction of one actually guilty. See also: *Shaw v. United States*, 244 F.2d 930, 939, 17 Alaska 1 (9th Cir. 1957). The presiding Justice in this case injected no such qualification into his description of the presumption.

### V–B

 In connection with the presiding Justice's explanation of who bears the burden of proof, defendants complain of the following language:

> "This was a relatively poor country [two hundred years ago]. The people who lived here and worked here, except for perhaps a few, were without any substantial means. . . . And the people . . . felt . . . that . . . the State, the Government . . . had the police officers . . . the ability and financial resources to seek out, search out, and find the evidence of guilt certainly more so than the individual of that day. And so they placed the burden where it could be sustained on a financial basis, if nothing else . . . .
>
> "Today under our present circumstances the State has certainly all of the resources, all of the ability, the police officers, the investigators, all available means whereby it can produce and bring forth, and show evidence of guilt. And although there may be individuals capa-

ble, financially able to do so, I think the majority of us are not. But in any event they placed it upon the State, the accusing authority, and that's where it has been for two hundred years, and that's where it is today."

Again, by objection after the conclusion of the charge, defendants preserved this issue for our review. They assert error in that (1) the locus of the burden resulted not from pragmatism but from the same desire to protect the innocent which underlies the presumption of innocence; and (2) the mistaken emphasis on relative resources was particularly prejudicial in this case, where defendants had retained both out-of-state and local counsel.

We agree that the placing of the ultimate burden of proof on the State reflects a desire to prevent unjust convictions. *Brinegar v. United States*, 338 U.S. 160, 174, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). We nevertheless do not find irrelevant or misleading the practical considerations cited by the presiding Justice. More important, we note that he in no way indicated that the State did not bear its usual burden *as to these defendants*. Thus, as with the contested instruction on the presumption of innocence, there was no hint that these defendants were not to receive all the benefits the law accords them.

To speculate that the jury shifted the burden of proof to defendants because they perceived defendants' resources as relatively great[13] and therefore concluded the purpose of placing the burden on the State was not served in this instance would be to attribute complex functional analysis, totally in opposition to the presiding Justice's charge. Except in extreme cases, and this is not one, we presume that jurors follow faithfully the Court's instructions. *State v. Trask*, Me., 223 A.2d 823, 827 (1966). Cf. *Jackson v. Denno*, 378 U.S. 368, 381–383, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Bruton v.*

---

**13.** Perhaps even more dubious is defendants' assumption that the presence of several attorneys representing them would lead the jury to believe defendants were wealthy. Surely many lay people are aware that the State often provides defense counsel at its own expense. Further, nothing in the evidence indicated that defendants were financially well-off.

*United States*, 391 U.S. 123, 128–129, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

### V–C

 Defendants' complaint regarding the quantum of proof concerns this portion of the charge:

"[A reasonable doubt] is just exactly what the words say—a doubt for which you, as a rational, sound, intelligent person can ascribe a reason. . . .

"The doubt that certain facts that require proof and satisfaction in your mind that when you go out to the Jury room, you sit around the table out there, you are discussing these facts or one particular fact, and you expose a doubt that you think and believe that you have . . . that you listen to your words as they are coming out of your mouth, as you are telling of this doubt to your fellow jurors. Are you embarrassed at the sound of the words that come out? Do they sound hollow and empty? Do you feel as if you wanted to stop talking because there doesn't seem to be any sense in what you are saying. You don't believe it yourself . . . .. Or as you are explaining the doubt that you have to your fellow jurors, the words flow easily. Do they sound logical and the more you talk about them the more sound they feel or seem, or your face doesn't get flush[ed] and you feel at ease and not embarrassed? You have a reasonable doubt."

Because defendants failed to bring their objections to the attention of the Justice below, we will consider them only if the now contested instruction operated to deprive defendant of a fair trial. Rule 52(b) M.R.Crim.P., *State v. Pomerleau*, Me., 363 A.2d 692 (1976). We are satisfied that it did not.

We believe that the above quoted language, standing alone, could have led a juror to conclude that a reasonable doubt was one he could *articulate* to his fellow jurors. While we have previously approved instructions indicating that a juror should be able to *ascribe a reason* for his doubt, we simultaneously indicated that a requirement of *articulation* is erroneous. *State v. Maxwell*, Me., 328 A.2d 801, 805–806 (1974).[14]

The presiding Justice therefore should not have alluded to the jurors' ability to express their doubts with ease. We nevertheless believe that the improper instruction did not deprive defendants of a fair trial. *State v. Pomerleau*, supra.

We regard any impermissible impact upon the jury as minimal. Each juror knows that the ability to communicate clearly varies from juror to juror. If a juror is convinced of, and able to ascribe at least to himself a reason for doubt, the juror will not easily be dissuaded from it merely because of inability to formulate it with precision to others. Further, this particular jury was several times instructed that many of its functions—assessing credibility, for example—would be accomplished by inarticulable methods.

Defendants have isolated only one small part of the instruction on reasonable doubt. In addition to this portion, the presiding Justice explained at length that a reasonable doubt was one which would cause a person to hesitate to take a major step in business or family life—this being a facet of explanation we approved in *State v. McKeough*, Me., 300 A.2d 755, 763 (1973). He also instructed that a reasonable doubt was not a whimsical or fanciful one, in accord with *State v. Maxwell*, supra. See also: *State v. Heald*, Me., 367 A.2d 1372 (1977).

### VI

We have examined the other contentions raised by the appeals of defendants. Without need for discussion, we find them without merit.

14. We have never singled out any particular definition of reasonable doubt as the only correct one. *State v. Heald*, Me., 367 A.2d 1372 (1977); *State v. McKeough*, Me., 300 A.2d 755 (1973).

The entry is:

*Appeals denied.*

All Justices concurring.