STATE of Maine

v.

Ralph PHILBRICK.

Supreme Judicial Court of Maine.

Argued Sept. 8, 1988.
Decided Dec. 13, 1988.

**848**

Janet T. Mills, Dist. Atty., Craig Turner (orally), Asst. Dist. Atty., Auburn, for the State.

Louis J. Shiro (orally), Shiro & Shiro, Waterville, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and HORNBY, JJ.

CLIFFORD, Justice.

The defendant, Ralph Philbrick, appeals from a judgment of the Superior Court (Androscoggin County; *Delahanty II, J.*) entered on a jury verdict finding him guilty of gross sexual misconduct, 17–A M.R.S.A. § 253 (1983 & Supp.1987), and kidnapping, 17–A M.R.S.A. § 301 (1983). Philbrick contends the court erred (1) in failing to suppress out-of-court identifications made by the victim; (2) in permitting the State to amend its demand for notice of alibi; (3) in excluding the defense of consent; (4) in refusing to release the grand jury transcript; and (5) in excluding evidence. He further contends that the evidence is insufficient to support the convictions. We affirm the judgment.

The victim, a 22 year-old mother, reported to the police that she was kidnapped at knifepoint and sexually assaulted on January 9, 1987. She identified the defendant as the perpetrator of these crimes.

At the trial, the victim gave the following account of the rape. At around 7:30 p.m., after she brought her two year-old son to the home of his babysitter in Lewiston, she proceeded to walk down Lisbon Street toward a bar. Before she reached the bar a man who has since been identified as Philbrick pulled up in a white Thunderbird and asked her if she would like "to party." She declined the invitation and proceeded to walk towards the bar. About ten minutes later, Philbrick returned and asked her if she would like a ride. She accepted and the two drove to the parking lot of the Central Maine Youth Center, described by the victim as the "arena," on Jefferson Street.

There, the victim searched her purse for a cigarette. When she lifted her head, she saw that Philbrick held a knife at her neck. He then ordered her to take off her clothes from the waist down and she complied.

Philbrick drove out of the parking lot to the Kennedy Memorial Bridge and the two continued to drive in an area that soon became unfamiliar to the victim. Over the course of the ride, Philbrick ordered her to perform oral sex. He also forced her to have sexual intercourse with him in the parking lot of a school. The victim was dropped off on the Auburn side of the Kennedy Memorial Bridge. As the car drove away, the victim made a mental note of the license plate number. She then flagged down a ride to the hospital where she was examined.

About two or three hours later, after having returned home, the victim went to the Lewiston Police Station, where she described her assailant's vehicle as a white Thunderbird and recalled the license plate number. A police investigation revealed that the license plate belonged to Philbrick, a resident of Bangor and that a white Ford Thunderbird was registered in his name.

A few days after the incident, Philbrick's photograph was placed in a lineup of eight photographs and shown to the victim. The victim essentially told the police that if the assailant was one of the men in the pictures, he was Philbrick. After the photographic lineup, a police officer showed the victim a list of crimes previously committed by Philbrick.

In May 1987, a videotaped live lineup was arranged with counsel present. The victim again identified Philbrick as the assailant. At trial, the victim again identified the defendant as being her assailant.

## I.

Philbrick first contends that the victim's identification of Philbrick as the perpetrator is tainted by the suggestiveness of the out-of-court identification procedures used by the police.

■ The due process clause of the Fourteenth Amendment to the United States Constitution protects criminal defendants from the use of evidence derived from suggestive out-of-court identifications that are " 'conducive to an irreparable mistaken identification.' " *State v. True*, 464 A.2d 946, 949 (Me.1983) (quoting *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)). A two-part test was articulated in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), to weed out such unreliable identification. *See State v. Cefalo*, 396 A.2d 233, 236 (Me. 1979).

■ First, the burden is on the defendant to demonstrate by a preponderance of the evidence that the identification procedure used by law enforcement personnel was unnecessarily "suggestive." *Cefalo*, 396 A.2d at 236. Second, assuming the defendant meets that burden, the burden then shifts to the State to show by clear and convincing evidence that the corrupting influence of the unnecessarily suggestive procedure is outweighed by the reliability of the identification. *Id.* at 236–38.

■ The motion justice found there was nothing suggestive in the photographic lineup used by the police. The lineup contained eight black-and-white photographs of seven different individuals similarly posed with similar physical characteristics. Although the defendant's photograph does show part of what appears to be the police booking board marked "Bangor," the motion justice found this was not a factor in the victim's identification. The findings are not clearly erroneous.

■ More troubling is what occurred after the victim identified Philbrick from the photo lineup, when a police officer showed the victim a list of crimes committed by Philbrick. However, even if we were to conclude that the motion justice erred in his finding that there was no unnecessary suggestiveness in the lineup procedure, such error would be harmless because the motion justice further found that the identification of Philbrick had an independent basis, and that any corrupting effect of the suggestiveness was outweighed by the reliability of the identification. *See id.* at 236.

The victim spoke face to face with Philbrick at the open driver's window before getting into the vehicle and had multiple opportunities to observe Philbrick, heightened by the intensity of the circumstances. The victim of a rape is " 'no casual observer, but rather the victim of one of the most personally humiliating of all crimes.' " *Id.* at 241 (quoting *Neil,* 409 U.S. at 200, 93 S.Ct. at 383). The victim identified Philbrick from the photographic lineup only three days after the assault and again at the live lineup on May 1. Finally, Philbrick was again visually identified by the victim at the suppression hearing and at trial. The motion justice's finding that the victim's identification of Philbrick had an independent basis outweighing the suggestiveness of the police officer's comments about Philbrick's record is not clearly erroneous.

### II.

Philbrick next argues that the State should not have been allowed to amend its demand for notice of alibi.[1] We disagree.

Originally, in its demand for notice of alibi, the State had pinpointed January 10, 1987 from 7:00 p.m. until 11:00 p.m. to be the time of the crime. Approximately three months later, five months prior to the eventual trial date, after the defense had filed a motion for a bill of particulars, the State filed an amended demand for notice of alibi. In the amended demand, the State changed the date of the crime from January 10 to January 9.[2]

Philbrick asserts that the original demand should be binding in the same manner as a bill of particulars. Hence, he argues that the indictment should have been dismissed because of the "fatal variance" between the demand for notice of alibi and the State's intended proof at trial.

The service of a demand for notice of alibi by the State does not automatically restrict the scope of the State's proof at trial, *State v. Pinkham,* 384 A.2d 444, 446 (Me.1978), and is precluded from functioning as a bill of particulars if the defendant has properly filed a motion for a bill of particulars, as Philbrick did here. *State v. Benner,* 284 A.2d 91, 101 (Me.1971). Even if Philbrick had not moved for a bill of particulars, and the demand for notice of alibi did serve to restrict the State's scope of proof at trial, the granting of the State's motion to amend the demand for notice of alibi would not constitute an abuse of discretion, since Philbrick has shown no prejudice. *Pinkham,* 384 A.2d at 446. The State moved to amend its demand for notice of alibi five months prior to trial, allowing Philbrick ample opportunity to prepare his defense.

### III.

Philbrick attempted to present evidence that the victim was a prostitute, and contends that the court's exclusion of that

1. M.R.Crim.P. 16A(b) provides as follows:
   (b) Notice of Alibi. No less than ten days before the date set for trial, the attorney for the State may serve upon the defendant or his attorney a demand that the defendant serve a notice of alibi if the defendant intends to rely on such defense at the trial. The demand shall state the time and place that the attorney for the State proposes to establish at the trial as the time and place where the defendant participated in or committed the crime. If such a demand has been served, and if the defendant intends to rely on the defense of alibi, not more than five days after service of such demand, he shall serve upon the attorney for the State and file a notice of alibi which states the place which the defendant claims to have been at the time stated in the demand and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi. Within five days thereafter, the attorney for the State shall file and serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the State intends to rely to establish the defendant's presence at the time and place stated in the demand.

   If the defendant fails to serve and file a notice of alibi after service of a demand, the court may take appropriate action. If the attorney for the State fails to serve and file a notice of witnesses, the court shall order compliance pursuant to Rule 16(c)(1). The fact that a witness's name is on a notice furnished under this subdivision and that he is not called shall not be commented upon at trial.

2. The State filed subsequently a bill of particulars identifying the date of the crime as January 9, 1987.

evidence improperly prevented him from interjecting the defense that any sexual activity was consented to by the victim. Contrary to Philbrick's contentions on appeal, the record reveals that Philbrick's attempt to depict the victim as a prostitute was nothing more than an effort to impeach her by impugning her character, prohibited under M.R.Evid. 404. At no time did Philbrick assert that the proffered evidence was being offered to show that the sexual acts were consented to. Indeed, consent was never asserted by Philbrick as a defense at trial.[3] Evidence of consent would have been admissible. Philbrick made no offer of proof that the sexual acts on the night in question were consented to by the victim. M.R.Evid. 412 makes evidence of past sexual behavior of the victim of gross sexual misconduct inadmissible. However, evidence of specific instances of past sexual behavior of the victim with the defendant may be admissible on the issue of consent. See M.R.Evid. 412(b)(2). Philbrick did not make any offer of proof that he had a past sexual relationship with the victim. M.R.Evid. 103(a)(2) provides that "error may not be predicated on a ruling which ... excludes evidence unless ... the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." No such offer of proof was made here, nor was it apparent that Philbrick had any evidence of consensual sexual activity between himself and the victim. We find no error in the court's refusal to allow Philbrick to discredit the victim's character by attempting to show that she was a prostitute.

ant's use at trial. The grand jury proceedings were recorded and transcribed pursuant to the defendant's motions. See M.R. Crim.P. 6(f). The presiding justice, however, denied Philbrick's motion and refused to permit the release of the transcript and ordered that it be impounded until further order.

M.R.Crim.P. 6(g) provides that "... upon motion of the defendant ... and upon a showing of a particularized need, the court may order a transcript of the record of the evidence to be furnished to the defendant ... upon such terms and conditions as are just."

Philbrick argues that there were inconsistencies in the evidence justifying a release of the transcript.[4] They were not so glaring that without more showing, release of the grand jury transcript was compelled. See State v. Mahaney, 437 A.2d 613 (Me. 1981); State v. Doody, 432 A.2d 399 (Me. 1981); State v. Cugliata, 372 A.2d 1019 (Me.1977); Cluchey & Seitzinger, Maine Criminal Practice § 6.8, at 6–22. Moreover, the trial justice specifically left open the possibility of access for purposes of impeachment. He stated, "... [T]he court is not inclined to review [the transcript] until it becomes an issue as to whether there's a problem with testimony and so forth." At no time during the trial did Philbrick renew his request for inspection of the grand jury transcript. See Cugliata, 372 A.2d at 1025. We therefore find no abuse of discretion in the refusal by the trial justice to release the grand jury transcript.

## IV.

■ Philbrick argues that the trial justice committed error in refusing to release the grand jury transcript for the defend-

## V.

Philbrick further argues that the presiding justice erred by excluding from evidence testimony that the boyfriend of an

---

3. Philbrick consistently asserted that he was not the perpetrator. For example, in his opening statement, his attorney stated, "The defense here is a clear one. He wasn't there. He didn't do it. He's totally innocent. That is all." He filed a notice of alibi and relied on the alibi defense.

4. The victim described to the police an unusual mark on the assailant's sex organ, that a medical examination of Philbrick by the Androscog-

gin Sheriff's Department did not reveal; the victim did not comment on several scars and tatoos that evidence showed Philbrick had; the victim described her assailant's car as "fairly new" and as having red seats, when it was a 1977 model with maroon and white seats; and there was some evidence that an acquaintance of the victim had an altercation with Philbrick.

acquaintance of the victim owned a car similar to Philbrick's and testimony concerning the illumination of Philbrick's license plate, and by refusing to allow a videotape of the route allegedly traveled by the victim, viewed by the jury during trial, to be taken along with the other exhibits into the jury room. We find no abuse of discretion.

First, it was not an abuse of discretion for the trial justice to exclude testimony expected to establish that the boyfriend of an acquaintance of the victim owned a car similar to Philbrick's automobile. A trial justice has a wide scope of discretion in his rulings on relevancy, *State v. Gagne*, 362 A.2d 166, 170 (Me.1976); Field & Murray, *Maine Evidence* § 401.1, at 77 (1987), and Philbrick's proffered evidence was marginally relevant at best.

Second, any error in the exclusion of testimony as to the visibility of the license plate was rendered harmless by the fact that the jurors took an actual view of Philbrick's automobile.

Finally, the trial justice did not abuse his discretion in refusing to allow the videotape, already viewed by the jury, to be brought into the jury room along with a bulky monitor. The jury was free to request to have any part of the testimony read or played back if it desired.

### VI.

Finally, Philbrick contends that the victim's testimony is inherently contradictory, incredible and insufficient to support his conviction. Philbrick points to inconsistencies in the testimony of the victim. Many of the cited instances stem from statements made by the victim to the hospital staff and police shortly after the incident.

In testing the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether a jury could rationally find every element of the criminal charge beyond a reasonable doubt. *State v. Barry*, 495 A.2d 825, 826 (Me.1985). The uncorroborated testimony of a victim, if not inherently improbable, incredible or lacking a

measure of common sense, is sufficient to sustain a guilty verdict for a sexual crime. *State v. Pelletier*, 534 A.2d 970, 972 (Me. 1987); *State v. True*, 438 A.2d 460, 471 (Me. 1981). The victim's testimony here, although containing some inconsistencies, was not so contradictory, unreasonable, incredible or so lacking in common sense that it could not sustain the verdict.

The entry is:

JUDGMENT AFFIRMED.

All concurring.