STATE OF MAINE
PENOBSCOT, ss

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-02-128

STATE OF MAINE )
)

)
V. )
)
)
)
JEFFREY SIMPSON )

DECISION ON MOTION
TO SUPPRESS EVIDENCE

DONALD L. GARBRECH
LAW LIBRARY

AUG 20 2002

On March 4, 2002, the Penobscot County Grand Jury returned a four-count indictment against the Defendant in this matter, charging him with Burglary (Class A); Robbery (Class A); Reckless Conduct with a Firearm (Class C); and Reckless Conduct with a Firearm (Class C).[1] Pending before the Court at this time is the Defendant's Motion to Suppress all evidence obtained by police authorities in connection with this indictment. The Defendant raises three grounds for suppressing this evidence. He contends that police lacked sufficient probable cause to arrest him on January 28, 2002 and therefore all evidence obtained as the result of that arrest should be suppressed. He contends that a police photo array shown to witness Alana Edwards was impermissibly suggestive and therefore her testimony regarding her identification of him in this array should be suppressed. He also challenges the use of any tape-recorded telephone conversations in which the Defendant participated while in custody at the Penobscot County Jail.[2] The court heard evidence pertaining to the motion on May 17, 2002.

---

[1] The State dismissed Counts I and II of the indictment on February 14, 2002.
[2] The Defendant's motion also objected to any evidence obtained by wiretap but it appears that no wiretap was conducted and accordingly, the court does not address this issue. Similarly, the Defendant objects to

# BACKGROUND

While he was on duty on January 27, 2002, Bangor Police Department Officer Shawn Green received information via a radio broadcast to the effect that several days earlier there had been "an incident involving a gun on Second St. in Bangor and that the incident had also involved a person named Jeff Simpson and a person identified as "Nicole". The officer decided to follow up on this rather limited information by contacting a person who the officer thought might have additional information. This person was Ryan Dubay who was a person with whom the officer had been working on another case.[3] Dubay informed the officer that he had heard that Jeffrey Simpson had pulled a gun on a person named "Nicole" who lived on Second Street in Bangor.

Officer Green knew only one person by the name of "Nicole" who lived on Second Street and this was Nicole Martin. He decided to go speak with her to check on her well-being. He went to her apartment, but at that time, Ms. Martin was not home. The officer was, however, able to speak with another person by the name of Rachel King who lived in an upstairs apartment of the same building as Nicole Martin. Ms. King was also a person known to the officer and she reported that she had seen people running from Nicole Martin's apartment between nine and eleven in the evening on January 25, 2002 and that some of the people were making comments about "Jeff pulling a gun".

---

voice identification testimony from jail Corrections Officer Linda Golden, but it also appears that no such testimony will be offered by the State at trial of this matter and accordingly, this issue is also not addressed.

[3] Although not clearly established by the testimony, the inference from Officer Green's testimony is that Ryan Dubay was someone who was a witness to or who had knowledge about other unrelated criminal activity and who was acting as a source of information pertinent to another of the officer's criminal investigations.

The officer was not able to speak directly with Nicole Martin until the following day on January 28, 2002. When the officer was able to locate and interview Ms. Martin at her Second St. apartment, she told Officer Green that a number of her friends had gathered in the evening at her apartment to wait for her to return. The officer learned from Ms. Martin that Mr. Simpson had come to her apartment before she had returned home; entered; looked around; and left. Ms. Martin later returned and had been in the apartment for only about five minutes when there was a knock at the door. A person named Herman Rodriguez went to the door and opened it. Nicole Martin told Officer Green that Jeffrey Simpson pushed his way into her apartment while displaying a handgun.[4] He waived it around while threatening people in the apartment and then grabbed Ms. Martin by the shirt; pulled her to him and put the gun flush to Ms. Martin's temple and demanded money from her. She said that she had none. Herman Rodriguez then pulled out a $50 bill and told Mr. Simpson that he could have it. Mr. Simpson left with Mr. Rodriguez pushing him out the door. Ms. Martin was not sure if she heard gunfire outside after Mr. Simpson left.

After obtaining this information, he returned to the police station where he discussed what he had learned with his superior, Sgt. Potter who had apparently already received some information about the incident the previous night. The court infers that Jeffrey Simpson was a person already known to Officer Green based on the officer's testimony that he then checked available records and learned that Jeffrey Simpson was out on bail

---

[4] In reporting this incident to Officer Green, Ms. Martin specifically identified the person who entered her apartment as "Jeffrey Simpson" and she told the officer that Mr. Simpson liked to refer to himself by the nickname "Simms".

in connection with another matter. Taking this information also in account, Officer Green and Sgt. Potter determined that they had probable cause to arrest Jeffrey Simpson. The officers then obtained pictures of him, presumably from available law enforcement records, and distributed them to other police officers on duty along with instructions to locate Mr. Simpson. A warning that Mr. Simpson was probably armed and dangerous accompanied the notice to locate.

Later that same evening, Officer Green was notified that another police officer had located Mr. Simpson on Cedar St. Officer Green then went to the front door of Mr. Simpson's 157 Cedar St. apartment. As he arrived, Officer Hutchings radioed that he had Mr. Simpson in custody at the back door of the Cedar St. apartment. Officer Green testified that 157 Cedar St. is a few blocks away from Nicole Martin's Second St. apartment. Second St. and Cedar St. intersect and the two apartments are about 1/2 mile apart.

The officer testified that during his interview of her, Ms. Martin gave him both the name of "Simms" and "Jeffrey Simpson" as the name of the man who had pressed the gun to her temple and demanded money from her. She also provided a limited physical description of this person as being "short, having short hair, and wearing a jacket." It was the officer's impression that the assailant was a person known to Ms. Martin although the officer acknowledged that Ms. Martin indicated in her subsequent written statement given on January 29, 2000, that she did not know whom "Jeffrey Simpson" was at the time of the occurrence. The officer also didn't recall asking her specifically about Jeffrey

Simpson. Notwithstanding these points, Officer Green was clear in his testimony that Nicole Martin had given him the specific name of "Jeffrey Simpson" at the time of his interview of her.

Officer Green acknowledged also that Nicole Martin had never reported being the victim of a crime to police authorities. He also testified that he had never done any investigation of the reliability of Theresa Sutherland, who was the source of the information contained in the initial radio report that he received. He also acknowledged that he was not aware of Ryan Dubay's or Rachel King's criminal record.

After Mr. Simpson's arrest, he was taken to the Penobscot County Jail. Shortly thereafter and in the ensuing days, he was allowed to use the telephone, which was located in his area of the jail and available for inmate use. The Defendant either made or received a number of telephone calls during the week following his arrest. At the direction of Bangor Police Department Detective John Robinson and with his assistance, Linda Golden, a Sergeant with the Penobscot County Sheriff's Department produced a compact disk recording of tape recorded telephone conversations in which the Defendant allegedly participated. Sgt. Golden testified that she is the person responsible for the jail telephone system and that all calls made by inmates are recorded on the hard drive of the computer, which controls the telephone system. Sgt. Golden also testified that at the beginning of every call an automated message is played which advises both the caller and the recipient of the call that all calls are recorded and/or monitored. This recorded message is the only

notice or warning that telephone conversations were going to be recorded. There were no other signs, or notices posted anywhere.

Sgt. Golden said that she was requested by Detective Robinson to create a computer compact disk recording of calls made by Jeffrey Simpson on particular dates. The evidence indicates that neither Sgt. Golden nor Detective Robinson were familiar with Mr. Simpson's voice, but calls which Detective Robinson believed to contain Mr. Simpson's voice were recorded on the disk. The calls placed on the compact disk were identified by Detective Robinson on the basis of where they originated in the jail, on the basis of the dates on which they were made, and on the basis of their content.

Neither Sgt. Golden nor Detective Robinson had obtained any search warrant nor had they obtained any judicially sanction wiretap authorization. The Defendant challenges the use of any recorded telephone conversation attributed to the Defendant pursuant to 15 M.R.S.A. § 709 et. seq.[5]

Subsequent to Mr. Simpson's arrest in connection with this matter, Bangor Police Department Detective John Robinson assembled a photo-line up display.[6] On February 14, 2002 took it with him to the Bar Harbor District Court building where he anticipated finding Alana Edwards, a person believed by police to have been at Nicole Martin's

---

[5] 15 M.R.S.A. §§ 709-713(1980 & Supp 2001) Interception of Wire and Oral Communications, prohibits the interception of wire and oral communications by unauthorized person's and subject to certain exceptions set forth in 15 M.R.S.A. § 712 prohibits the use of such intercepted communications as evidence in court unless the interception falls within one of the §712 exceptions.

[6] The original of this display was admitted as State's Exh. #1 and a photocopy of the display were admitted as Defendant's Exh. #8

apartment on January 27, 2002 at the time of the alleged incident involving Mr. Simpson. Detective Robinson found Ms. Edwards in the lobby of the Bar Harbor District Court. He told her that he wanted her to look at some photographs and see if she could identify anyone. No one else was present at the time. Ms. Edwards looked at the display and "within seconds" identified subject #3 as "the person who committed the robbery". The Defendant is shown as Subject #3 in the photo lineup. Ms. Edwards wrote the date of her viewing the display, provided her initials and wrote, "His eyes. He's the one." on Defendant's Exh #8. Detective Robinson testified that he neither asked Ms. Edwards questions nor engaged her in any further discussion of the matter following her identification of the Defendant.

As is evident from the exhibit itself, State's Exh. #1 contains six black and white photographs showing six male subjects from the neck up. Each individual has a close cropped hair cut; none has facial hair; all are Caucasian and of approximately the same age. The objection raised by the Defendant pertains to the fact that a small portion of each individual's head is cut off in their photographs with the exception of his own photo which depicts his head fully without any cropping at all. The Defendant argues that this photo lineup is therefore impermissibly suggestive and the identification made by Ms. Edwards should be suppressed.

## DISCUSSION

I.    **Was there sufficient "probable cause" to arrest the Defendant Jeffrey Simpson on January 27, 2002?**[7]

---

[7] The Defendant has also challenged the initial stop by Officer Hutchinson in this case which occurred immediately prior to his arrest. A finding of probable cause, as the court makes in this instance, subsumes a

The Law Court has articulated the controlling standard in the following manner,

> "Probable cause to arrest exists when facts and circumstances of which the arresting officer has reasonable trustworthy information would warrant an ordinarily prudent and cautious police officer to believe the subject did commit or was committing a crime. The test is objective. The test is not whether a particular arresting officer believed he had cause to arrest. The test is rather whether on the basis of reasonably trustworthy available information the generic "ordinarily prudent and cautious officer" would have probable cause to arrest." *State v. Boylan* 665 A.2d 1016 (Me. 1995) (internal citations omitted)

The Law Court has also indicated that " [T] he amount of evidence necessary to establish probable cause "is less than the level of a fair preponderance of the evidence." *State v. Bolduc* ME 255, ¶ 7,1998. 722 A.2d at 45.

The court accepts the testimony of Officer Green and finds that on January 27, 2002, he did learn of an incident on Second St. involving a gun, Jeffrey Simpson and a person identified only as "Nicole". The court infers that the officer had safety concerns for a person he knew as Nicole Martin who was the only person he knew had the name of "Nicole" on Second St. and further that he suspected criminal activity warranting further investigation. His investigation led him to interview, independently of one another, two other individuals previously known to him.

From the Ryan Dubay interview, he obtained information that a Jeff Simpson had pulled a gun on "Nicole" on Second St. and from the Rachel King interview he learned that people were running from Nicole Martin's downstairs apartment and that as they exited the apartment, at least one member of this group had made a statement about "Jeff"

finding of a reasonable and articulable suspicion. *State v. Babcock* 361 A.2d 911 (Me 1976). The challenge to the officer's initial stop is therefore not further discussed herein.

pulling a gun. Subsequent to these interviews, Officer Green spoke directly with Nicole Martin who gave him a first hand account of what a person named Jeffrey Simpson had done on January 25, 2002. This account is set forth herein and at the very least, clearly describes both the crime of robbery( 17-A M.R.S.A. § 651(1)(E) and of reckless conduct with a firearm (17-A M.R.S.A. § 211(1). It was also consistent with the information previously provided by both Ryan Dubay and Rachel King.

The Defendant argues that Officer Green lacked any basis for crediting Theresa Sutherland, Mr.Dubay or Ms. King as reliable or credible sources of information and he cites case law in his legal memorandum in support of his position that where an arrest and/or stop is based on information provided by an informant, there must be some moderate indication of reliability. Defendant's brief, page two citing *Florida v. J. L.* 529 U.S. 266 (2000).

While it is true that the record does not disclose a great deal about what Officer Green knew of the background of any of the individuals who were supplying him information and while it does appear that each may have personal histories which fairly call their credibility into question, the fundamental difference between the instant case and the precedents cited by the Defendant is that the instant case does not involve an arrest based on an informant's hearsay tip. The arrest in this case was based on a victim's personal account of a serious crime provided to the officer directly by the victim of that crime within several days after it had occurred. In this instance,the victim's account was consistent with and therefore to some extent corroborated by the statements of two other

witness. These were Ryan Dubay who provided only hearsay information but also by Rachel King who gave a first hand account of what she actually heard and saw. Looking at the evidence possessed by the officers as a whole at the time of Mr. Simpson's arrest, and having in mind the relatively low standard of proof required, the court is satisfied that the officers of the Bangor Police Department did in fact have sufficient "reasonably trustworthy information" that would have led a "reasonably prudent officer" to conclude that Jeffrey Simpson had engaged in criminal conduct and therefore they had sufficient probable cause to arrest Jeffrey Simpson on January 27, 2002. Accordingly, the court denies the Defendant's Motion to Suppress based on a lack of probable cause to arrest.[8]

## 2. Does 15 M.R.S.A. § 713 require the suppression of any tape-recorded telephone conversations in this case?[9]

---

[8] Information that the officer acquired after the arrest pertaining to the source of the original radio broadcast and the criminal histories of Ryan Dubay and Rachel King are irrelevant as would be the subsequent statement given by Nicole Martin after the arrest indicating that she did not know Jeffrey Simpson. The evaluation of the adequacy of the basis for a probable cause determination must be made on the basis of the information in the possession of the officer at the time of the arrest and not on the basis of information subsequently acquired.

[9] 15 M.R.S.A. § 713 provides: The contents of an interception are not admissible in court, except that the contents of an interception of any oral or wire communication that has been legally obtained under the law of another jurisdiction in which the interception occurred or that has been legally obtained pursuant to section 712, subsection 2 or 3 is admissible in the courts of this State, subject to the Maine Rules of Evidence.

15 M.R.S.A. § 712 (3) provides: It is not a violation of this chapter for a county jail investigative officer, as defined in this chapter, or for a county jail employee acting at the direction of a county jail investigative officer, to intercept, disclose or use that communication in the normal course of employment while engaged in any activity that is a necessary incident to the administration of criminal justice, if:

    A.  Either the sender or receiver of that communication is a person residing in an adult section of the county jail; and

    B.  Notice of the possibility of interception is provided in a way sufficient to make the parties to the communication aware of the possibility of interception, which includes:

        (1) Providing the resident with a written notification statement;

        (2) Posting written notification next to every telephone at the jail that is subject to monitoring; and

The Defendant argues that he has not been provided with any discovery information which would bring the tape recorded telephone conversations within the exception set forth in 15 M.R.S.A. § 712. At the hearing in this matter, it was clear from the testimony of Sgt. Golden that she was a county jail investigative officer.[10] It was also clear that she was engaged in an activity, which was incident to the administration of criminal justice.[11] The court accepts her testimony that all phone calls including those in which the Defendant may have participated are preceded by a recorded message that provides a warning to the parties to the communication that the call may be intercepted. This brings the telephone recordings made by Sgt. Golden within the exception of 15 M.R.S.A. § 713 (3)(B)(3).[12] Because the exception applies, the tape recordings are not subject to exclusion pursuant to 15 M.R.S.A. § 713 and they will be available as evidence at trial, subject to the Maine Rules of Evidence.

**3. Was the photo array shown to Alana Edwards impermissibly suggestive?**

The Defendant's final challenge to the evidence in his case pertains to the photo array shown to Alana Edwards. The due process clause of the Fourteenth Amendment to the United States Constitution prevents use of evidence derived from unduly suggestive out-

---

(3) Informing the recipient of a telephone call from the resident by playing a recorded warning before the recipient accepts the call.

[10] 15 M.R.S.A. § 709(4-B) provides that: "County jail investigative officer" means an employee of a county jail designated by the county jail administrator as having the authority to conduct investigations of offenses relating to the security or orderly management of the county jail.

[11] By virtue of 15 M.R.S.A. § 709 (1-A), the term "administration of criminal justice" has the same meaning as set forth in 16 M.R.S.A. § 611(1) which provides: "Administration of criminal justice" means detection, apprehension, detention, pretrial release, post-trial release, prosecution, adjudication, correctional supervision or rehabilitation of accused persons or criminal offenders. It includes criminal identification activities and the collection, storage and dissemination of criminal history record information.

[12] The state also argues that the recordings were not "intercepted" and is therefore on that basis are also not subject to exclusion. The court's finding that an exception does exist renders it unnecessary to discuss this point.

of-court identification procedures conducive to irreparable mistake identification. _State v. Prentiss_ 557 A.2d 619 (Me 1989(citing _State v. Philbrick_ 551 A.2d 847 (Me 1988)). Maine has adopted the two step test or procedure set forth in _Neil v. Biggers_, 409 U.S. 188 93 S.Ct.375, 34 L.Ed. 2d 401 (1972) by which to evaluate out-of-court identifications.

The first step requires the Defendant challenging an out-of-court identification to prove by a preponderance of the evidence that the procedure used by law enforcement personnel was impermissibly suggestive. In the event that a Defendant meets this first requirement, the burden then shifts to the State to show by clear and convincing evidence that the corrupting influence of the unnecessarily suggestive procedure, which was used, is outweighed by the reliability of the identification. _State v. Philbrick_ 551 A.2d 847 (Me 1988). Because the court finds that the Defendant has not met his threshold burden of demonstrating that the photo array was impermissibly suggestive, it is not necessary to discuss the second prong of the two-step analysis.

The court finds that State's Exh #1 is not impermissibly suggestive. It sets forth an array of six black and white photos of six different male subjects ,quite similar in appearance, and all similarly posed against the same background. All have the same close-cropped hair cut and all are about of the same age.

The only basis upon which the Defendant maintains the line up is suggestive is that the Defendant's photo is the only one where the head of the subject is not slightly cropped at the top. While this is true, the court does not find this to create such a striking disparity

in the appearance of the subjects so as to become impermissibly suggestive. This difference is not one to which the observer's attention is immediately drawn. The difference does not in any way interfere with the depiction of the principal identifying facial features of each individual. The small amount of hair which is present in the Defendant's photo (or which is absent on the photos of the other subjects) is insignificant in the court's judgment and could not be seen to have influenced Ms. Edwards in her identification of the Defendant.

Because the Defendant has not sustained his threshold burden of demonstrating the occurrence of an impermissibly suggestive out-of-court identification, the court denies his motion to suppress Ms.Edwards out-of-court identification.

The entry shall be that the Defendant's Motion to Suppress is denied in all respects.

Date: 8/9/2002

_____
JUSTICE, SUPERIOR COURT

ATTORNEY FOR THE STATE:

Michael Roberts, Deputy D.A.
97 Hammond Street
Bangor, ME   04401


ATTORNEY FOR THE DEFENDANT:

Marie Hansen Esq
P O BOX 924
Bangor   ME   04402-0924